**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTHERN MATERIALS COMPANY, Inc., Respondent.**

**No. 9604.**

United States Court of Appeals Fourth Circuit.

Argued Jan. 7, 1965.

Decided April 28, 1965.

Sobeloff, Circuit Judge, dissented.

Paul J. Spielberg, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Nancy M. Sherman, Atty., N. L. R. B., on brief), for petitioner.

Daniel R. Coffman, Jr., Jacksonville, Fla. (Hamilton, Bowden & Coffman, Jacksonville, Fla., on brief), for respondent.

Before SOBELOFF and BRYAN, Circuit Judges, and HUTCHESON, District Judge.

STERLING HUTCHESON, District Judge.

In March, 1962 United Industrial Workers of North America of The Sea-

farers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO and Inland Boatmen's Union of The Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO, hereinafter referred to as the Union, began a campaign among the employees of Southern Materials Company, Incorporated of Norfolk, Virginia, hereinafter referred to as the Company, for the purpose of organizing the employees in order that the Union might become bargaining agent for the group.

There was an energetic campaign conducted by the Union. The Company undertook to meet the issues by conducting a campaign in opposition. Representatives of the Company made speeches to groups of employees, had personal discussions with some of them and mailed letters pointing out the benefits provided employees by the Company.

On June 4 the Union petitioned the National Labor Relations Board, hereinafter referred to as the Board, for an election. The Company voluntarily consented to the election which was held on June 28.

In the meantime Teamsters Local 822, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, hereinafter referred to as Teamsters, intervened and was also placed on the ballot.

At the election the Company received 344 votes, the Union received 196 and the Teamsters 2.

On July 6, 1962 the Union filed objections to the result of the election charging the discriminatory discharge of fourteen employees and verbal misconduct by the Company in violation of Section 8(a) (1) of the National Labor Relations Act.

In advance of the hearing before the Trial Examiner counsel for the Company directed to the General Counsel interrogatories seeking discovery of facts believed to be of aid in defense. The Trial Examiner denied counsel the right to have these interrogations answered and

on appeal that action was affirmed by the Associate Executive Secretary.

As a result of proceedings before the Board we are here concerned with only two of the fourteen employees alleged to be victims of discrimination; the finding of the Board that the Company violated Section 8(a) (1) of the Act by coercing employees; and whether the Board should permit pre-hearing discovery.

(1) *The Termination of Employment of Jack B. Harris.*

Harris was a truck driver at Campostella during the time of the election campaign. He was a supporter of the Union, although it appears that in at least one conversation with a company official he expressed his opposition to the Union. Actually, he was rather actively in favor. On June 5, 1962, while on Company time in the dispatcher's office, he made threats of serious personal violence in a conversation with two other drivers, one a colored man, neither of whom had joined the Union. For this he was discharged on June 9.

In the week before the election, the Company posted official notices concerning the election, at the instruction of the Board. These notices contained sample ballots and other information. One was in a glass covered bulletin board in the truck shop at Campostella, which board was unlocked and was used for the posting of various notices to employees. At that time, Saturday, June 23, 1962, Harris had been discharged. The sample ballot appeared on the center panel of the notice. On the same day, a Company propaganda leaflet was placed on the same bulletin board below and to the left of the official notice. No one worked in the truck shop on Sunday, June 24, and the doors were closed and locked. About 11:30 P.M. on that night, Jack B. Harris entered the truck shop by opening the doors and took two flashlight photos of the bulletin board. The first did not turn out well, so he took the second. That photo shows the center panel of the official notice covered by the Company propaganda leaflet.

The Vice-President of the Company noticed the coverage of the official notice about 5:30 A.M. Monday, June 25, when he came to work and immediately had the Company leaflet removed from the official notice. The Company attorney was notified of the coverage and of its removal.

Despite the testimony of an employee that he saw the conditions shown by the photo on Friday, June 22, and continuously thereafter through June 27, which was denied by Vice-President Gourley and mechanic Jenkins, the Trial Examiner concluded the leaflet was not over the notice on Saturday evening and that it was removed early Monday morning.

■ Despite the overwhelming proof as disclosed by the record that Harris broke into the shop, placed the notices on the bulletin board as described and took the photo for the admitted purpose of prejudicing the Company and that he had theretofore made threats of serious bodily harm in connection with Union activity on Company premises and on Company time, the Board has ordered his immediate and full reinstatement, without prejudice to seniority and other rights and that he be reimbursed for any loss of pay he may have suffered.

The bare recital of the facts is sufficient to show the impropriety of the action of the Board.

(2) *Termination of Employment of William H. Sawyer.*

This employee was a crane operator who had been employed by the Company for over 20 years, the last 12 years' service being at Richmond. On June 15, 1962, the Company being in need of a crane operator at the Lynchburg plant, suggested that Sawyer be transferred to Lynchburg. The situation was an emergency one and a relief operator was needed in Lynchburg on Monday, June 18. Sawyer was at first reluctant to accept a transfer, but after talking with his wife decided to do so. His work week on the new assignment was 4 hours shorter and he was required to do no work after 1 P.M. on Saturdays. He remained on this job for 3 weeks, during which time the Company paid his transportation, hotel room and board.

The election was held on June 28, 1962 and on July 3 Sawyer quit his job. It is clear from the record that Sawyer was deeply concerned with the outcome of the election, being an ardent advocate of the Union. It is equally clear from the record that the transfer to Lynchburg was in the ordinary course of operation of the business. According to the testimony of Sawyer himself, he is quick tempered and he was in good standing with the Company when he quit. The Board places emphasis upon the fact that Sawyer was not offered a transfer back to Richmond. Sawyer did not request such transfer, but apparently left in a pique because of the failure of the Union to win the election. After notifying the Company on the Saturday he was quitting, he agreed to continue 2 days longer at the request of Company officials. Some time later after returning to Richmond, he called one of the Company officials to make inquiry concerning reemployment. He was told that he would have to see President Hofheimer and Vice-President Wingo. In response to that advice, Sawyer indicated he was not further interested and he obtained a position with another concern.

■ There is a considerable amount of testimony concerning this episode, including conversations alleged to have taken place from time to time. While the Company admittedly opposed the Union in the election, the record as a whole does not support the charge of discrimination on account of Union activities in its dealings with Sawyer. On the contrary, the record reveals that Sawyer was a valued employee of many years standing, on close personal terms with his superiors, who apparently felt free to discuss matters with him. Being disappointed and resentful because of the outcome of the election, which obviously caused feelings to run high, in a fit of anger Sawyer gave notice that he would quit. After thinking it over, he called Mr. Emerson concerning reemployment, and being told he would have to

apply to Messrs. Hofheimer and Wingo for reinstatement he refused to do so.

The Board has picked out several episodes to undertake to justify its action in ordering the reinstatement of Sawyer but a consideration of the record as a whole clearly reveals that Sawyer quit his job voluntarily after the outcome of the election was known. No request for a transfer to Richmond was made by him. The reluctance of the Company to lose his services was demonstrated by the request that he continue and he did continue his work for two days longer. After his return to Richmond he made inquiry concerning reemployment. This inquiry met with no rebuff. He was simply directed how to proceed. For some reason he was unwilling to make application to the officials named and for reasons of his own he sought and obtained employment elsewhere.

(3) A careful examination of the 271 pages of the Joint Appendix, of which 208 pages consist of transcribed testimony, fails to sustain the charge of improper or coercive conduct of Respondent.

An analysis of the examination and cross-examination of the 31 witnesses who testified, clearly points up the conclusion stated. A detailed discussion would be unreasonably tedious and burdensome.

It is sufficient to say that of those employees who testified concerning such acts, only four alleged to have been the subject of violation of Section 8(a) subsection (3) were called as witnesses in behalf of the Union by General Counsel. In substance, the testimony of the entire 15 witnesses called by General Counsel from a group of 542 voting employees ranged from references to what they considered vague threats consisting of inquiries from the Company as to whether the witness had joined the Union or how the witness felt concerning the election to inflammatory testimony containing threats of discharge. Much of this testimony was not only without corroboration, but was flatly denied or discredited. It is incredible to believe the Company would have made the threats alleged in some of the testimony that the Board has chosen to accept as true, rejecting credible, corroborated evidence.

It is significant that no witness was called to prove an assertion of fact contained in a written communication issued by the Area Director of the Union dated July 2, 1962, filed as Respondent's exhibit #4.

Respondent's exhibit #4 contains the following language:

"It is common knowledge that the Company bought off some of their employees who voted in the election".

It is this same communication which charges the Company with causing the death of an employee by an improper work assignment, because of his vote for the Union. The record is strangely silent concerning these serious allegations made a few days after the election, which election the Union lost by a vote of 344 to 196. They were barely mentioned in the vigorous cross-examinations by General Counsel conducted in March, 1963. Surely they would have been of interest, if true, in casting light upon the propriety of setting aside the election and directing a new election.

It is evident that both the Union and the Company conducted vigorous preelection campaigns. It is evident that some bitterness crept into the campaign. Incidents in point involve the conduct of Jack B. Harris, who on Company time made threats of serious physical violence and broke into the office building during night time to take a picture of the bulletin board by which he fraudulently undertook to place the Company in the position of having tampered with the election notice. There is no corroboration of such conduct on the part of the Company as Harris attempted to show and it is preposterous to believe the Company would have been guilty of such unwise conduct. The Union undertook to prejudice the Company by distorting certain expressions of justifiable indignation made by two of the officers after the election concerning the charge in ex-

hibit #4 that the Company caused the death of an employee.[1]

Viewed as a whole, and bearing in mind the discretion invested in the Board, we find that there is not substantial, credible evidence to prove violation by the Company of Section 8(a) subsection (1) of the Act.

█ (4) The brief filed in behalf of the Board does not reveal the Board's position with respect of the refusal to allow pre-hearing discovery. In view of our disposal of the other questions, it becomes unnecessary that we pass upon this issue except to observe that the Board, acting in a quasi judicial capacity as it does, should freely permit discovery procedure in order that the rights of all parties may be properly protected.

In this case, the Company asserts that it was prejudiced in presenting its defense by not having certain information. Conceivably, the Company might have even more fully shown the unreliability of the proof offered by the Union in support of its charges.

For the reasons stated, a decree enforcing the Board's order will be, and the same hereby is, denied.

Enforcement denied.

---

1. RESPONDENT'S EXHIBIT NO. 4

"United Industrial Workers

SIU    AFL    CIO

Norfolk, Virginia
July 2, 1962

*To All Southern Materials
Employees:*

Dear Sir and Brother:

Watch out for the National Labor Relations Board to void and throw out the election that was conducted on June 28th, 1962.

THE U.I.W. Lawyers advise us that the evidence now on hand will prove that Southern Materials is guilty of numerous unfair charges.

It is common knowledge that the Company bought off some of their employees who voted in the election.

The U.I.W. is confident that we will win the next election with plenty of room to spare.

Southern Materials men now have seen for themselves that they have a democratic right to vote, which the Company cannot deny them.

A typical example of Southern Materials treatment of employees took place at the Kingsland Reach Plant last Friday the day after the election which is as follows:

The 65 men employed at this plant get a half hour off for lunch each day without pay and some of the men for the past several years have been going up to a restaurant for a sandwich.

This plant went solid Union on Thursday and the men made no bones about letting the Bosses (Potts and Emerson) know it.

On Friday eleven men came back to work within the half hour allowed.

*Emerson* went out of his way to jump all over these men and told them that in the future they were not leaving the plant.

Emerson especially bawled out an *old* Mechanic by the name of *Randy Heath*. (Heath had told Emerson the day before the election that he was voting for the Union.)

Emerson also knew that Heath suffered from asthma and a heart condition.

Emerson ordered Heath to get to work on an engine in a confined space which Heath had never been ordered to work in before.

Ten minutes later Heath dropped dead.

Heath always worked in the Mechanic Shop where he kept his medicine.

Southern Materials didn't even have the decency to stop the work operations while this man lay dead on the ground.

They didn't even have anybody with first aid knowledge to help this man.

The U.I.W. charges that if anybody ever helped put somebody in the grave, Southern Materials did in this case.

Furthermore, Potts had the guts to fire one of the workers that offered to knock the hell out of Emerson because of what Emerson (through the Company's anti-union policy) did to Randy Heath.

We will have more on the Randy Heath issue later.

NOW HERE'S A MESSAGE
FOR HOFHEIMER.

You layed the ground rules for the U.I.W. to follow.

Remember, each and every employee should call us collect and report immediately any discrimination by Company Bosses.

Fraternally yours,
Gordon Spencer,
Area Director."

SOBELOFF, Circuit Judge (dissenting).

The court is, of course, familiar with the established principles applicable to judicial review of Labor Board findings, and there is no point in reiterating them. My disagreement arises from what I regard as a misapplication of these standards and a substitution of the court's conclusions for those of the Board which are strongly supported. Instead of inquiring whether there is support in the record as a whole for the Board's conclusions, the court's inquiry here seems to be whether there is evidence to support a contrary conclusion.

The majority states that the company "had personal discussions" with some of the employees, but there is scant attention to the character of these discussions. These were not bland conversations. The record is replete with evidence of bitter and coercive interviews, persistent attempts to pry into individual employees' union attitudes and activities, interrogation of workers to discover what had happened at union meetings, probing as to the number of union pledge cards an employee had in his pockets, direct questions to employees as to how they intended to vote in the representation election, coupled with warnings to "better leave it [the union] alone," threats of pay cuts, loss of bonuses and vacations if the union won the election.

In the context woven by many such incidents the Board was well within the bounds of its authority in holding that the employer had violated section 8(a)(1) of the Act. The holding should not be disturbed.

Out of this background arose the two discharges found by the Board to be discriminatory under sections 8(a)(3) and (1).

### Violations as to Jack Harris

The court, substituting its conclusions for those of the Board and its Examiner, finds that Harris was discharged for threatening two other employees. Although Harris may have made such threats on June 5, there is substantial support in the record for the Board's view that the employer merely seized upon them as a pretext to discharge Harris for his pro-union views and activities. Southern Materials had been under the firm impression that Harris was an anti-union employee, but from the above incident it learned for the first time that he held pro-union views. Harris was thereupon summarily discharged even though his work record during three years of employment was unblemished. One of the two employees to whom his threats were addressed was an anti-union man who had likewise threatened Harris, but only Harris was singled out for severe discipline. No action whatever was taken against the anti-union employee. It was for the Board, not this court, to interpret these events and determine the real motivation for the discharge.

The employer and now the court undertake to bolster their view by reliance on Harris' activities after his discharge. These later events could not possibly have entered into the company's decision to discharge him. There is no justification for importing into the case Harris' post-discharge conduct. Nor is a reviewing court authorized in a case of this nature to apply *sub silentio* the doctrine of unclean hands, or to substitute its policy views for those of the Board.

### Violations as to William H. Sawyer

This employee was deliberately hounded out of his job because he dared to assert his lawful right to assist the unionization effort. There is substantial evidence to support the Board's conclusion that Sawyer was discriminatorily transferred from his home in Richmond to Lynchburg, and that his treatment was designed to force him to quit his job. The court prefers to believe the employer's version that Sawyer was transferred when, in the normal course of the employer's business at Lynchburg, an "emergency" arose, and that Sawyer "agreed" to a change in assignment. It further finds that Sawyer quit his job in "disappointment" over the union's loss of the election. In doing so, it overlooks

several highly significant facts underlying the Board's conclusion.

After Sawyer, an active union adherent, rejected Vice-President Wingo's suggestion that he persuade fellow employees to vote against the union, Wingo chided Sawyer for "messing around" with the union and getting the employees "upset." Several days later and, by happy coincidence from the employer's standpoint, less than two weeks before the election, an "emergency" was created by the company's firing of its crane operator in Lynchburg. Sawyer was the Richmond crane operator summarily chosen to be transferred, notwithstanding that the company had in Richmond two other crane operators, one of whom had previously worked in Lynchburg. Both of these had less seniority than Sawyer, and although he pleaded that his wife was ill, no consideration was shown him. He was peremptorily told, "You have to go or quit."

The Board found that the employer's true motivation was first manifested in the order of transfer, and still more clearly highlighted when Sawyer reached his new duty station. Immediately on his arrival in Lynchburg he was questioned by his foreman as to possible union activities. The foreman persisted and there was another unpleasant encounter. Sawyer decided to quit rather than run the risk of "further trouble" which might provoke him to attack the supervisor if he continued harassing Sawyer for his union activities. When informed of Sawyer's decision to quit, Wingo, who had found fault with Sawyer for "messing around" with the union, made no effort to ascertain the reason despite Sawyer's good record of twelve years.

This evidence presents at least an adequate basis—some might think it a compelling one—for the Board's conclusion that Sawyer's sudden transfer to Lynchburg and harassment there by his foreman stemmed from the company's fear and resentment of his union activities. It also fully supports the Board's inference that Sawyer's decision to quit was not a volitional act but the inevitable result of the employer's anti-union discrimination. NLRB v. Tennessee Packers, Inc., 339 F.2d 203 (6th Cir. 1964).

*Other 8(a) (1) Violations*

Instead of addressing itself to the specific charges of 8(a) (1) violations in an effort to determine whether the Board's findings are supported by substantial evidence, the court undertakes to deal with matters of credibility of witnesses, inferences to be drawn from failure to call witnesses and other matters. While this approach is appropriate for a hearing examiner, these matters are not so broadly in our discretion. We are barred by our limited scope of review from making an independent judgment when the record contains solid support for the findings under review.

Because I think that there is substantial basis for the Board's findings, I would enforce its order.