**FIRESTONE SYNTHETIC FIBERS COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondents.**

No. 10639.

United States Court of Appeals Fourth Circuit.

Argued Dec. 7, 1966.

Decided Feb. 10, 1967.

Winter, Circuit Judge, dissented in part.

Robert H. Patterson, Jr., Richmond, Va. (Robert A. Drash and McGuire, Woods & Battle, Richmond, Va., on brief), for petitioner.

Paul J. Spielberg, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Herman M. Levy, Atty., N. L. R. B., on brief), for respondent.

Before BRYAN, WINTER and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge.

Is the order of the National Labor Relations Board "supported by substantial evidence on the record considered as a

whole"? We think not and deny enforcement. The standard is that of the statute, 29 U.S.C.A. Section 160(e) and (f), as interpreted in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

## BACKGROUND

Firestone Synthetic Fibers Company is a wholly-owned division of the Firestone Tire and Rubber Company, Akron, Ohio. At the Hopewell, Virginia, plant Firestone's hourly-paid plant workers had been represented by the Union[1] since 1960. In 1964 the Union began its organizational activities among the Company's laboratory technicians. The Company agreed to a consent election, and on February 12, 1965, the election was held. The Company won by a vote of twenty-six to eleven.

At the time of the hearing, Firestone had in effect approximately 140 collective bargaining contracts covering some 25,000 employees. During the past five years, no more than ten unfair labor practice charges, whether by individuals or the union, have been leveled against the Company.[2] Firestone's excellent labor relations record, evincing no animosity toward unions, was acknowledged at the hearing by Board counsel.

After losing the election, the Union filed unfair labor practice charges and objections to the election. After a consolidated hearing on both, the Trial Examiner recommended, and the Board adopted and promulgated, an order[3] requiring the Company to cease and desist from:

"(a) Threatening employees with loss of benefits, discharge, or other economic reprisals for joining, assisting, or engaging in activities on behalf of * * * [the Union], or any other labor organization; or to influence their votes at a Board election.

"(b) Excluding, or threatening or attempting to exclude, from participation in any medical, pension, retirement income, or other employee benefit plan, any employee or class of employees by reason of the fact that such employees have designated a collective-bargaining representative in accordance with the provisions of the Act.

"(c) In any like or related manner interfering with, restraining or coercing employees in the exercise of rights guaranteed by Section 7 of the Act."

The case is here upon Firestone's petition to review and set aside the order and the Board's answer requesting enforcement.

## THE 8(a) (1) THREAT TO DISCHARGE EMPLOYEE EVELEE JUHASZ

The Trial Examiner's findings with respect to the threatened discharge of Evelee Juhasz consists of eighteen lines in an eleven-page decision. The entire findings are set out in the margin.[4] The

---

1. International Union of District 50, United Mine Workers of America.

2. The record does not disclose how many complaints were actually issued based upon the ten charges. Objection of General Counsel to this inquiry was sustained by the Trial Examiner.

3. The election was also set aside and a second election ordered at such time as the Regional Director deems appropriate. The order of the Board requiring a new election does not constitute a final order reviewable by the courts under Section 10 of the Labor Act. AFL v. NLRB, 308 U.S. 401, 409, 60 S.Ct. 300, 84 L.Ed. 347 (1940).

4. "Employee Juhasz worked on the afternoon shift. In the morning of the Wednesday preceding the Friday election a union meeting was held at her home and she was selected to be the union observer at the election. Upon reporting for work that afternoon she was approached by her shift supervisor, Hanley, whose status as a management representative is conceded by the Respondent. Hanley told her that he knew of the meeting at her home and informed her that 'we'—the supervisors—had also held a meeting the same morning, and that she had been a subject of their discussion. He declared that Sprouse, the general laboratory supervisor, 'blamed' her for bringing the Union in

Trial Examiner noted that he did not credit Hanley's denial that he had this conversation with Juhasz because his demeanor on the witness stand displayed marked discomfiture. Credibility is for the Trial Examiner and the Labor Board, but here "the Trial Examiner has not only totally disregarded the testimony of all company witnesses but has consistently ignored all unfavorable testimony elicited from" the *only* union witness testifying with respect to the threatened discharge. Riggs Distler & Co. v. NLRB, 327 F.2d 575, 580 (4th Cir. 1963). Mrs. Juhasz said enough to support the findings set out in the margin, but she also said much more. She characterized her conversation with Hanley as "just a conversation back and forth between Dave and myself." She conceded that Hanley told her "not to let his discussion with me influence my decision over the Union." The possible coercive effect upon her of the alleged threat was diminished somewhat by her understanding, according to her testimony, that Wayne Sprouse was going to "get" her whether the Union won the election or not. The Trial Examiner found that Mrs. Juhasz reported the Hanley conversation to a shop steward. But he omitted the reaction of the shop steward, who, according to Mrs. Juhasz, responded, "Evelee, they can't fire you over this. Why are you upset?"

On cross-examination, Mrs. Juhasz' answers were no more responsive than they were on direct. Asked if she and Wayne Sprouse (source of the alleged threat) had misunderstandings, her answer was "I have no respect for Wayne, if that's what you're saying." In response to the next question, she then refused to say that she did not like working under Wayne Sprouse "because Wayne is a fine person as far as the work is concerned. Wayne helped me a lot." Yet, Mrs. Juhasz never inquired of Sprouse whether he had made such a threat. Sprouse denied it and was not cross-examined by Board counsel.

It comes to this: if threatened at all, the source of the threat was Wayne Sprouse, transmitted to the witness by Hanley, who was sympathetic with the employee, and not taken seriously by the shop steward to whom Mrs. Juhasz reported it.

The alleged threat was made on February 10, 1965. Although Evelee Juhasz "had several illnesses at Firestone" and had been out due to illness for some six weeks in the fall of 1964, she was never discharged, and remained in her position until she herself resigned shortly before the hearing date, June 30, 1965.

■■ Although the alleged coercive conversation lasted for "a good two hours" according to Mrs. Juhasz and took place in the laboratory in plain view of other employees, *no other* witness was called by Labor Board counsel in corroboration of her story. The Trial Examiner makes no mention of the omission, but the Board in its brief argues that it was for the Company to call other employee witnesses to prove the negative of the alleged threatening conversation. We think otherwise. Firestone had attempted unsuccessfully to use discovery procedures, including interrogatories, to learn the names of Board witnesses. If the Labor Board may sometimes have sufficient reasons for delimiting discovery in order to protect employees from company reprisal, it must accept the burden of producing more evidence than might otherwise be necessary. It is basically unfair for Labor Board counsel to argue to this court that the Company should have produced witnesses whose names were unknown to the Company because of a policy decision of the Board. See NLRB v. Southern Materials Co., 345 F.2d 240, 244 (4th Cir. 1965).

---

and had stated that he would 'get her,' one way or another, whether the Union won the election or not. Juhasz asked Hanley, since he well knew the quality of her work, why he did not defend her.

Hanley replied that 'he's got us all' and there was no way of his 'saying anything.' Juhasz, upset by this threat, told both the union steward and other girls of the incident."

We think this single conversation, if it ever occurred, did not interfere with, restrain, or coerce Evelee Juhasz or any other employee in the exercise of the rights guaranteed in Section 7 of the Labor Act. It is perhaps significant that Mrs. Juhasz herself did not testify that she felt restrained or coerced, nor did she testify that she quit her union activity. For all we know she took Hanley's advice seriously and did not "let his discussion with me influence my decision over the Union."

What was said in Quaker State Oil Refining Corp. v. NLRB, quoted with approval by the Fifth Circuit in Schwob Mfg. Co. v. NLRB, 297 F.2d 864, at 870 (5th Cir. 1962), is pertinent here:

> "Isolated statements by minor supervisory employees made casually in conversations with fellow employees without the knowledge of their employer and not in the course of their duty or in the exercise of their delegated authority over those employees ought not to be too quickly imputed to their employer as its breach of the law." 119 F.2d 631, 633 (3d Cir. 1941).

■ The conclusion of the Board that the Company interfered with, restrained, and coerced employees in the exercise of Section 7 rights by threatening the discharge of Evelee Juhasz is not supported by substantial evidence when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed the Board's view.[5]

## 8(a) (1) THREAT OF LOSS OF NUMEROUS BENEFITS FOR LABORATORY EMPLOYEES IF THEY SELECT A BARGAINING AGENT

■ This phase of the government's case concerns alleged statements of supervisors Lyckberg, Smith, and Hanley to employees Juhasz and Bridgeman.

Hanley's alleged statements (not the discussion in respect to discharge of Mrs. Juhasz previously considered) are not included in the complaint. We said in NLRB v. Threads, Inc., 308 F.2d 1, 9 (4th Cir. 1962), "evidence without a supporting allegation cannot serve as the basis of a determination of an unfair labor practice." Even so, we are reluctant to inject procedural technicalities into administrative proceedings. There would be less occasion for our doing so if trial examiners would permit, within protective limitations, reasonable discovery procedures.

The statement attributed by Mrs. Juhasz to Hanley was that he had not heard of any union employees who were not clock workers [6] and his expression of opinion that in the event of a union victory the laboratory employees would not keep the benefits that they now had. Out of context this seems coercive. But again, the Trial Examiner ignored the rest of what Hanley allegedly said.[7] This alleged threat is subject to the same weakness, viewing the record as a whole, discussed in the preceding section. Mrs. Juhasz did not testify that either Hanley or any other Firestone supervisor actual-

---

5. Counsel have filed a joint appendix as authorized by 28 U.S.C.A. § 2112 and have stipulated that all of the relevant portions of the record are contained in the joint appendix.

6. Hourly-paid workers in the collective bargaining unit at the Hopewell plant punched a time clock.

7. The entire testimony on this phase was:
   "Q What did Dave say?
   "A Dave didn't know a lot about the insurance, like I said, he said he didn't know concerning the insurance, that they had discussed with him about the time clock. He did open the time clock with us, well, that's what he said, I don't know of any company that is union that don't punch a time clock. He said, we would not keep the benefits that we now have. He said, you will not gain anything by it. He said, your first concern is if you don't get the Union this time you've got another chance next year. Think about it, listen to what the people have got to say that have talked to you. Weigh the thing. I don't think anyone talked to him from our lab. They might have, I don't remember at that time."

ly threatened to take away any of her benefits. The sum total of her testimony is that she gathered from a factual comparison of the benefits that if the Union won she might have fewer benefits than she presently enjoyed.

It was Lyckberg and Smith[8] who openly discussed the coming election with the employees and spoke with the clear authority of the Company. The Board's witnesses (Juhasz and Bridgeman) testified that the company representatives promised the employees nothing. On cross-examination, Mrs. Juhasz conceded that Mr. Lyckberg did *not* say "if the Union came in we would not be salaried or we would have to punch a clock." Mrs. Bridgeman likewise conceded on cross-examination that Lyckberg never actually "came out and said if the Union came in we would have these benefits taken away."

Viewing the record as a whole, it is clear that the employees were not threatened or coerced by oral statements of representatives of the Company.

Board counsel concedes in this court that the company letter of February 9, 1965, by itself is not unlawful.[9] Nor is it made unlawful by being read in context with the testimony of General Counsel's witnesses as to what was said to them by Hanley and Lyckberg. On the contrary, the vague and contradictory testimony of the General Counsel's witnesses is made intelligible by the letter.[10] which is clearly within the protection of Section 8(c) of the Labor Act.[11]

## DISCRIMINATORY BENEFIT PLANS FOR UNION AND NON–UNION PERSONNEL

Since 1950 Firestone has had in effect a great many benefit plans for its employees. The first one (1950) resulted from negotiations between Firestone and the United Rubber Workers of America and was available to all employees who were on the date of the agreement in any designated bargaining unit represented by this Union. The same insurance benefits were made available to Firestone's hourly-rated employees who were not union members, and employees who participated in that plan were defined as being eligible because "not represented by a designated collective bargaining agent." Obviously the terminology was descriptive in origin rather than discriminatory.

Since 1950 numerous other benefit plans have been put into effect, including some designated for employees who come within the descriptive terminology "salaried employee of the company not represented by a designated collective bargaining agent." Conversely, other plans define the eligible employees as those who *are* represented by various collective bargaining agents.[12]

The Trial Examiner ridiculed the Company's contention that the language was descriptive rather than discriminatory. Somewhat injudiciously he disparaged the contention by characterizing the Company as urging that the language "was conceived in innocence, born of magnanimity, and maintained in the

8. Smith authored the letter considered *infra*.

9. Counsel for the Labor Board in oral argument stated, "let me say that I think perhaps by itself this letter would not amount to a violation of the Act."

10. Pertinent excerpts from the company letter are included in the Trial Examiner's decision.

11. Section 8(c) reads:
"(c) The expressing of any views, arguments, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not con-

stitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."

12. We think it unnecessary to recite in more detail the numerous plans that were in effect over a fifteen-year period. The Trial Examiner was about to reject the Company's proffer of the various plans as being immaterial until Board counsel, with commendable impartiality, came to the aid of company counsel, expressing the view that they were material.

family merely as a means of identifying groups of employees in the various plants: those with and those without a bargaining representative." We think the record as a whole clearly indicates that the language is not discriminatory and not violative of Section 8(a) (1) of the Labor Act as found by the Board, but it is instead merely descriptive. There is not the slightest indication in the record that the Company has ever taken the position that it will refuse to make available to union-represented employees any plan that it may have available for employees who are not so represented. On the contrary, the record shows that the Union never requested that the major medical and pension plans available to unrepresented salaried employees be made available to unionized hourly-paid employees, choosing instead to bargain for other benefits.

■ This court "is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. NLRB, supra, 340 U.S. at 488, 71 S.Ct. at 465, 95 L.Ed. 456.

In applying that standard, we are "not to abdicate the conventional judicial function." Id. at 490, 71 S.Ct. at 466.

The order of the Board is set aside except for the order for the new election as to which this Court has no jurisdiction.

Order set aside in part.

WINTER, Circuit Judge (dissenting in part).

I agree that Firestone's benefit plans for its employees were not discriminatory within the meaning of § 8(a) (1) of the Act, and, in view of the concessum of counsel for the Board about Firestone's letter of February 9, 1965, that the record as a whole does not support a finding of a violation of § 8(a) (1) by the oral

statements of the supervisory employees. I disagree, however, with the conclusions of the majority that the record as a whole does not support the finding that Firestone interfered with, restrained or coerced employees in the exercise of their § 7 rights by threatening the discharge of Evelee Juhasz. Admittedly, this aspect of the case is of little moment, because Mrs. Juhasz was not discharged. She voluntarily resigned about four months later, and the Board's order requires no specific affirmative relief as to her.[1] But, lest the bar and my fellow-judges treat silent acquiescence on my part as an indication that I believe the decision of the majority binding on me as a correctly decided precedent, I state my views in dissent on this aspect of the case.

The findings of the trial examiner with respect to the threatened discharge of Mrs. Juhasz are set forth in a footnote in the majority opinion. Their correctness is to be determined by an examination of the record as a whole. Nothing could be less significant than the number of lines of an eleven-page decision they constitute.

When the record as a whole is examined it shows that Mrs. Juhasz, who had been active in union meetings and who had just been chosen to be a union observer at the forthcoming election, was told, practically on the eve of the election, by Hanley, her immediate supervisor, that Sprouse, the next in the pyramid of authority had made the statement that "the company is blaming you for bringing this situation into the plant," and that "he [Sprouse] was going to get you whether the Union came in or whether it didn't come in" and that "they're going to have to pin it on somebody and it's going to be you they're going to hang." Conveniently buried by the majority is the fact that, in addition to this conversation's having taken place in the presence of other employees about to vote in the election, Mrs. Juhasz testified that she discussed its substance with her fel-

---

1. The Board's order requires a new election, but Mrs. Juhasz would be ineligible to vote.

low-employees on her shift who were eligible to vote in the election.

The only denial that the conversation took place came from Hanley, whom the trial examiner found not to be a credible witness; *there was no denial that the conversation was reported to fellow-employees.*

While the majority admit that credibility is for the trial examiner and the Board and not this Court, they avoid the impact of Mrs. Juhasz's testimony on a basis which is to me not supportable, either as a matter of fact or as a matter of law. True, the record shows that Mrs. Juhasz was reassured by the shop steward to whom she reported the conversation. On the record, the extent to which she was personally shaken by the incident may have been questionable to the trier of the facts, even though she did testify that she cried immediately after it occurred and found it necessary to get other employees to do her work. But even if we usurp the functions of the trial examiner and substitute our view of the weight of the testimony for his, there was nothing in the record to establish that fellow-employees to whom the incident was reported received any assurances from any source that the manifestly coercive statements were in fact repudiated. Recently, we held in Intertype Company v. N.L.R.B., 371 F.2d 787 (4 Cir. 1966), that communication to "at least" one employee that there was surveillance of a union meeting by supervisory employees, absent a showing that employer disavowal of invidious motive was known to that employee, was sufficient to support a finding of a violation of § 8(a) (1) of the Act.[2] Today, I think we depart from that view.

To my mind, the majority mount an unsuccessful attack on the credibility of Mrs. Juhasz. I know of no rule of law which requires that she be corroborated

if the trier of the fact otherwise found her credible. The law makes no such demand even in a criminal prosecution. I would enforce the part of the Board's order which rests upon the testimony of Mrs. Juhasz.

---

2.  The authorities cited by the majority are inapposite—the *Quaker State* case because the statements made were not coercive and not made by those having direct supervision of the employees to

whom they were made, and the *Schwob* case because the employees knew the supervisors had no authority to speak for the employer on the subjects discussed.