**RED CIRCLE CORPORATION**

v.

The **UNITED STATES.**

No. 430–66.

United States Court of Claims.

July 17, 1968.

Robert D. Witte, New York City, attorney of record for plaintiff; Lewis, MacDonald & Varian and Maurice J. Gilchrist, New York City, of counsel.

J. Michael Gottesman, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

SKELTON, Judge.

On September 26, 1961, and again on October 20, 1961, plaintiff contracted with the United States through the Military Clothing and Textile Supply Agency, subsequently the Defense Clothing and Textile Supply Center ("DCTSC"), for the production and delivery, in monthly quantities, of approximately 159,000 foot lockers. The total price was approximately $1.5 million. The complaint, brought here from a decision of the Armed Services Board of Contract Appeals (hereinafter the "Board"), seeks reversal of that portion of the Board's decision No. 10570, dated November 24, 1965, which denied plaintiff's claim for an equitable adjustment under the Changes Article of both supply contracts numbered 11088 and 11312, respectively. Aside from resolution of the controversy concerning the government's counterclaim, which will be considered in a later portion of this opinion, the major issue confronting us is whether the defendant's right to change its verification inspection procedure flowed from the Changes Article, or existed independently of the provisions of that article with no duty to compensate the plaintiff for its increased cost of performance. In the circumstances of this case, we choose the latter fork and sustain the Board's decision via its factual and legal conclusions.

Before delving beneath the surface of plaintiff's claim, we will set forth the salient facts found by the Board.

## I

### Changes in Inspection Procedure

Production of the foot lockers commenced in December 1961, and inspection was initially exercised by the New York U. S. Army Engineer District ("USAED"). The plaintiff had only a day shift and the USAED inspector examined units as they came off the end of the assembly line. A day's production was a "lot." If accepted, the units were wrapped, marked, and banded, loaded on trailers and transported to box cars on a siding two miles away. Although the contracts required that the contractor would assemble the foot lockers into a stationary lot at its plant for verification inspection, the defendant at first did not implement inspection at the plaintiff's factory, but rather on the aforementioned box cars. This is sometimes referred to by the parties as "moving lot" verification inspection which did not require accumulation of completed foot lockers on plaintiff's premises.

In January 1962, plaintiff added a night shift. The night production was stored in the building and when the inspector came on duty (he worked only during the daytime), he examined them and if accepted, they were processed and shipped. Examination of the day production continued as previously.

Initially the day production constituted a "lot." Later, a day and night pro-

duction made up a lot. No lots were ever rejected by USAED inspectors.

In March 1962, an inspection official from DCTSC examined some delivered foot lockers at New Cumberland, Pennsylvania. He found serious defects such as sharp edges, gaps in the panels, a hasp that would not close, rough and improperly sanded panels, and missing or cocked rivets. The result was that DCTSC asked the New York Defense Clothing and Textile Quality Control Office ("DCTQCO") to take over inspection which it did on April 19, 1962. The method of inspection used by DCTQCO was somewhat similar to that of USAED except that samples were drawn from the moving daytime production line and set aside to be inspected with samples drawn from the accumulated night production. A written "Plan for the Inspection Job" ("PIJ") was drawn up and executed by the plaintiff and the DCTQCO inspector on April 30, 1962. Inspection was continued as previously described. It reads in part:

LOT PRESENTATION: Lots are presented on the basis of 2 shift production, day and night. Approximately 400 to 500 lockers are produced by each shift. Night production is stored in trailer trucks and a proportionate sample is drawn from these trucks in the morning. The remaining samples are drawn from the day's production prior to loading the lockers on the trucks. This is the sample size to be inspected the following day.

Reports of defective foot lockers continued and DCTSC became increasingly dissatisfied with the inspection procedure. Since lockers were trucked by the plaintiff to railway cars after samples had been drawn, it was felt that surveillance of the lot by the inspector prior to acceptance was being lost. Different lots were sometimes placed in the same box car and the government felt there was a danger of commingling even though boxes bore lot serial numbers.

About June 20, 1962, DCTQCO changed the method of inspection by requiring, as the contract language specified, that all foot lockers comprising a lot under inspection be kept on plaintiff's premises until the samples were drawn and tested; and the lot was accepted. A unilateral amendment to the PIJ was issued by the DCTQCO inspector on June 25, 1962, reading in part:

Stationary lots will be completely packed and marked. Lots will be stacked in such a manner that the QCR [Quality Control Representative] will be able to draw samples from any part of the lot.

The plaintiff had limited space for the storage of end items at its factory, and the accumulation of lots on the premises for inspection interfered with production. Thus, plaintiff seeks recovery for the extra cost of its production occasioned by the defendant's change in verification inspection procedure.

First, plaintiff contends that the contracts provided defendant with an election, prior to the commencement of performance, between "moving lot" and "stationary lot" methods of verification inspection. The defendant, it asserts, having elected the former, established it as the contractually designated procedure which could not be thereafter changed except pursuant to the Changes Article. Alternatively, plaintiff says that the PIJ was a written acknowledgment of the moving lot method of verification inspection originally chosen by the defendant which constituted a contract modification establishing a single method of verification inspection. Plaintiff also relies upon the doctrines of waiver and estoppel in seeking to establish its right to a recovery.

Both contracts provide for inspection pursuant to the "Contractor Inspection and Quality Control Manual" ("Manual") and MIL–STD–105B, December 31, 1958, "Sampling Procedures and Tables for Inspection by Attributes." The Manual provides for a sampling examination by the contractor on each completely processed lot of items (III, 2a). Sampling may be conducted by the con-

tractor on (1) a "moving lot" ("sample units of items are randomly selected at different times throughout a specific production period from items that are being collected. * * * it is essential that the moving lot be adequately identified."); or (2) a "stationary lot" (" * * contractor may select a sample from end items that are assembled into a stationary lot."); or (3) both moving and stationary lots (III, 2b).

The Manual further states that the results of the examination will be presented to the Government Quality Control Representatives ("GQCR"). When the examination record is presented to the GQCR, the lot represented by the record "shall be assembled into a identifiable, stationary lot so that the Government Quality Control Representative, at his discretion, may draw samples to verify the contractor's examination results" (III, 2c). A "stationary lot" is defined by the Manual as "A lot which is physically collected and formed for examination at one time and place" (I).

MIL–STD–105B states that when a lot inspection is conducted by the government, the lot formation, the lot size, and "the manner in which each lot is to be presented and identified by the supplier shall be designated by the responsible inspection activity." It also provides that:

> * * * The supplier shall provide adequate and suitable storage space for each lot, equipment needed for proper identification and presentation, and labor for all handling of product requisite to drawing of samples and lot inspection. (5.3)

█ Since in our view the cited provisions authorized the government to require the contractor to accumulate the lot in some reasonable identifiable form in one location so that verification inspection could be performed, we think, plaintiff asks us to conclude that the defendant elected off premise lot accumulation for this purpose instead of lot ac-

cumulation at the contractor's factory as demanded by the contracts.[1] In fact, the plaintiff asks us to hold that the defendant is barred from invoking the contractually designated inspection site.

The theory advanced in support of the claim, no matter what labels accompany it, is that the defendant complied with its contractual duty to elect and designate, prior to the commencement of performance, the inspection procedure to be followed, namely, off-premise lot accumulation. The plaintiff says that it is of great significance that the defendant, through its authorized representative, was fully aware prior to the commencement of performance that plaintiff did not have sufficient available space in the non-production areas of its premises to store both raw materials needed for performance and completed production lots. It was for this reason that the defendant inaugurated an inspection procedure which would avoid the problem.

At the outset, we should mention that the contracts, did not, as plaintiff demands, set up two alternative and inconsistent procedures for verification inspection. The contracts state that the inspection and shipping point is "Same as Contractor's Address" which is the factory location. Under the contract provisions, the defendant was entitled to insist that the plaintiff present its inspector with an identifiable stationary lot at the plaintiff's factory for complete verification inspection. The strict enforcement of contractual terms by an inspector does not constitute undue interference with the contractor, as the government is entitled to full contract compliance. The contracts established a single procedure for verification inspection and did not require the defendant to make an election. Therefore, while we agree with both parties that off premise lot accumulation was an attempt to establish an operative method of verification inspection by the government inspector prior to the commencement of

---

1. In its reply brief, plaintiff no longer identifies the alleged election of the government as being between "moving" and

"stationary" lot inspection, but rather between on or off premise lot accumulation for verification inspection.

contract performance, we can not allow the plaintiff to convert personal efforts by government inspectors to accommodate the parties' respective interests into a claim for compensation. See Williamsburg Drapery Co. v. United States, 177 Ct.Cl. 776, 788–789, 369 F.2d 729, 736 (1966). Cf. WRB Corp. v. United States, Ct.Cl. No. 67–62, decided April 19, 1968, slip op. p. 46. The clauses pertaining to verification inspection in the instant contracts must be considered for the benefit of the government, and the plaintiff's responsibility was not affected by the failure of the government to fully exercise its contract rights. Indeed, we would be setting a dangerous precedent to hold that the government relinquished a contract right for doing what merely amounts to lending a helping hand to the contractor.

■ Another independent ground for denying the plaintiff recovery at this junction, prior to consideration of the parties' execution of the PIJ, is that the plaintiff could not have detrimentally changed its position in reliance on the conduct of government inspectors. As will be recalled, the main thrust of the plaintiff's arguments is that *prior to the commencement of performance*, the defendant set up an inspection procedure less burdensome to the contractor than required by the contracts. This theme is readily identifiable because it is frequently mentioned in the plaintiff's briefs. Therefore, the plaintiff's reliance on the doctrines of election, waiver, and estoppel, is misplaced since its position convinces us that the more costly on-premise lot accumulation for verification inspection must have been considered in the preparation of its bid. Cf. Natus Corp. v. United States, 178 Ct.Cl. 1, 12, 371 F.2d 450, 457 (1967). Indeed,

if it was taken into account, which we must presume was the case, a recovery for the plaintiff would permit it to receive a windfall, i. e., that for which it has already been compensated under both contracts.[2] See WRB Corp. v. United States, supra, at 198 n. 2.

The difficulties experienced by the plaintiff resulting from the accumulation of completed lockers on the premises must be considered its responsibility. It had the obligation to provide sufficient space for storage of a lot submitted for verification inspection. If the accumulation of foot lockers interfered with production, the resulting injury cannot be charged to the government as it should have been anticipated by the plaintiff. Although the Board noted a factual dispute on the issue of whether the plaintiff represented to the pre-award surveyor that it had adequate storage space, we agree with the Board that it is unnecessary to resolve this conflict. The fact that plaintiff was contractually obligated to provide the necessary storage space for completed foot lockers would not be changed by any alleged representation communicated after the preparation of its bid.

■ The plaintiff argues, alternatively, that even if the specifications did not require an election by the defendant, bilateral execution of the PIJ which continued inspection as originally instituted, constituted an agreement modifying the specifications to establish a single contractually specified inspection procedure. The later change in inspection procedure is then said to have become a contract change requiring additional compensation. The defendant maintains that the specific terms of the PIJ reject any theory of contract modification.

2. The plaintiff weakly suggests that "perhaps prior to contract" it relied on defendant's choice of verification inspection. This position, if it means prior to bid, is not accompanied by adequate record citation and we pay no attention to it. Furthermore, it is significant that the inspection provisions of the contracts were

not even altered to give the government inspectors a contractual choice between on or off premise lot accumulation. The initial method of inspection as we have stated, was a result of the defendant's efforts to accommodate the spatial limitations of the plaintiff's factory.

The paragraph relied upon states as follows:

> Nothing mentioned herein authorizes any deviation from contract and/or specification requirements. The inspection office may at any time change to [sic] the above plan by written notice.

There was nothing in the PIJ or the surrounding circumstances to indicate that it was intended to establish a binding contractual method of verification inspection. We agree with the Board's conclusion that the PIJ reflected only a working arrangement between the signators. It provided that the contract and specifications were not changed. It was subject to change by the inspection office at any time by written notice.

■ The plaintiff next urges that the tightened inspection procedure was due to defective foot lockers caused by rivet failures, and for this reason the defendant's change in inspection procedures was improper. The Board did in fact determine that a portion of the blame rested with the government. But it found that rivet problems were only a part of the general picture at the time inspection procedures were changed. There were various other defects besides cocked and loose rivets which led to inspection changes which the Board considered was a reasonable course of conduct. These findings are supported by substantial evidence and cannot be disturbed. We, therefore, do not decide whether an inspection official must comply with a standard of reasonableness in exercising a contractual right.

In conclusion, we hold that plaintiff has not demonstrated the existence of a contract change entitling it to extra compensation.

## II

### Counterclaim

### Defective Specifications

The plaintiff also asserted a claim before the Board for rework of the foot lockers prior to shipment. The claim consisted of labor, materials, and mark-up. The rework was accomplished after the discovery of defective foot lockers either by the plaintiff's employees or a government inspector at the factory. The plaintiff alleged that the specifications, which prescribed the particular plywood for use in the manufacture of the foot lockers, were defective. The government attributed the defective foot lockers to poor workmanship.

The Board did find that the specifications were defective, and that the plaintiff was entitled to an equitable adjustment for extra costs incurred in reworking foot lockers attributable to the defective nature of the plywood. However, it also determined that poor workmanship was a contributing factor. The Board, therefore, sustained the plaintiff's claim to entitlement but remanded the case for determination of the equitable adjustment.

Subsequent to the Board's decision, the parties negotiated an agreement which provided that the plaintiff incurred $37,000 in rework expenses as a result of defective specifications. The government paid this amount to plaintiff and its recovery is the object of the government's counterclaim. It asserts that the Board's decision lacks the essential ingredient of substantial evidence as discussed below.

■ We have held, and now affirm, that jurisdiction is vested in the Board under either the standard Changes or Changed Conditions Articles, depending upon the circumstances, to equitably adjust the contract price for the direct costs, if any, flowing from defective plans and specifications. Delay damages resulting from government fault in such cases is treated separately as a breach of contract, initially redressable in court, unless there is that type of Suspension of Work Clause inserted in the contract which converts the cause of action to one "arising under" the contract. See generally, Phillips Constr. Co. v. United States, Ct.Cl., 394 F.2d 834, decided May 10, 1968; Clack v. United States, Ct.Cl., 395 F.2d 773, decided May 10, 1968; Jefferson Constr. Co. v. United

States, Ct. Cl., 392 F.2d 1006, decided April 19, 1968; and Maxwell Dynamometer Co. v. United States, 181 Ct.Cl. 607, 386 F.2d 855 (1967).

Under these circumstances, the Board's finding that satisfactory performance was not possible must be accorded finality, as it is supported by substantial evidence. We also determine that the other dispositions made by the Board are correct.

The Board concluded from the considerable testimony offered by the parties that there was no question that rivets driven through knots, voids and cracks in the specified plywood would often result in defective fasteners. Although foot lockers can be produced with the specified plywood, the Board determined that the high incidence of rivet failures would require a large amount of rework involving the replacement of sides, tops, and bottoms. Accordingly, the Board found no reason to make an exception to the general rule that there is an implied warranty that if government specifications are followed, a satisfactory product will result. The government agrees that substantial evidence in the record indicates that some rework was necessary. Its objection is directed at the Board's conclusion that a *large* amount of rework was necessary. Certainly, the Board may use its common sense in rendering evaluations and the one complained of does not appear to be unreasonable when viewing the facts in their entirety.

The defendant next contends that any claim of plaintiff based on defective specifications is barred by settlements made under the warranty clause. On December 20, 1962, the defendant made claim under the warranty clause for defective foot lockers received at the depots. The claim involved 39,094 units under 11312 and 52,757 units under 11088. On June 4, 1963, the contracting officer found that the contract price of 11312 should be reduced $8,080.44, and of 11088 $10,077.55, because of the defects. This amount was withheld from sums due plaintiff. Plaintiff appealed alleging that the cause of the defects was defective specifications (ASBCA No. 9256). The claims were settled on October 14, 1963, for the sums of $2,740.34 and $3,417.65, respectively. The supplemental agreements to the contracts implementing the settlement read in pertinent part:

2. The contractor hereby offers and the Government accepts the amount of $ * * * in full and complete settlement and adjustment of the Government's claim under Option 1 of the Warranty Clause.

Plaintiff's claim for rework by reason of defective specifications was submitted by letter dated August 21, 1963, less than two months prior to settlement of the warranty claim. On September 18, 1963, plaintiff wrote the contracting officer offering to settle the appeal from the contracting officer's decision of June 4, 1963 (the warranty claim) "* * without prejudice to this or any other issue presently in dispute between us * * *." The supplemental agreements settling the warranty appeal are dated October 14, 1963. On October 17, 1963, the contracting officer wrote plaintiff asking, among other things, for detailed information on plaintiff's claim based on defective specifications. Plaintiff furnished the detailed information on March 9, 1964. On January 14, 1965, the contracting officer denied the claim asserting the plywood and rivets were suitable components.

From this evidence, we are unable to find any indication that either party considered that plaintiff was settling its claim for defective specifications when the warranty claim was being settled. The supplementary agreements restrict the settlement to the warranty claim. There were no general releases included or other indicia of an intention to settle the respective claims generally. Also, the contracting officer asked for further detailed information concerning plaintiff's defective specifications claim after the execution of the warranty claim settlement. It seems inconceivable that the contracting officer

would then deny the claim based on defective specifications without mentioning the alleged bar of the warranty settlement agreement. It is even more inconsistent that the defendant would thereafter agree to settle the claim for $37,000 and pay that amount. We conclude that the defective specifications claim is not barred by the settlement of the warranty claim.

## III

### Summary

For the reasons indicated, plaintiff's motion for summary judgment with respect to its claim that it is entitled to an equitable adjustment is denied; defendant's cross-motion for summary judgment with respect to that item is granted; and the plaintiff's petition is dismissed. With respect to the government's counterclaim, the plaintiff's motion for summary judgment is granted; and the defendant's cross-motion for summary judgment is denied; the counterclaim is dismissed.