**DATRONICS ENGINEERS, INC.**

v.

**The UNITED STATES.**

**No. 157–66.**

United States Court of Claims.

Dec. 12, 1969.

Sylman I. Euzent, Washington, D. C., attorney of record, for plaintiff.

Robert R. Donlan, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge,* and DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner James F. Davis with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 99(c) [since September 1, 1969, Rule 166(c)]. The commissioner has done so in an opinion and report filed on May 2, 1969, wherein such facts as are necessary to the opinion are set forth. Exceptions (request for review by the court) were filed by plaintiff. Defendant accepted the commissioner's opinion with an exception concerning his denial of defendant's counterclaim. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner (with a minor change in the conclusion), it hereby adopts the same, as hereinafter set forth, as the basis for its decision in this case. Therefore, plaintiff's motion for summary judgment is denied and defendant's cross-motion is granted. Defendant is entitled to recover on its counterclaim only to the extent of $162.-50 (as found by the Armed Services Board of Contract Appeals) and judg-

* Laramore, Judge, took no part in the consideration and decision of this case.

ment is entered for defendant on its counterclaim in the sum of $162.50. Plaintiff's petition is dismissed.

## OPINION OF COMMISSIONER

DAVIS, Commissioner:

The issue here is whether defendant properly terminated plaintiff's contract for default. Plaintiff says the termination should be treated as one for the convenience of the government. If defendant is right, then another issue is whether the government correctly assessed against plaintiff excess costs for completing the contract.

### I.

Plaintiff's contract was with the Air Force to rehabilitate radio antennas serving Andrews Air Force Base at Brandywine, Maryland and Davidsonville, Maryland. At the transmitter site (Davidsonville), there were 20 antennas; at the receiver site (Brandywine), there were 22 antennas. The nature of the antennas is discussed below to the extent necessary to understand the issues. Rehabilitation work consisted of (1) dismantling, repairing, and rebuilding the antennas, and (2) laying new underground cable between antennas and communications buildings.

Plaintiff as low bidder was awarded the contract on February 18, 1963, for the price of $19,927.[1] The notice to proceed was issued on March 1, 1963; was received by plaintiff on March 4; and work was to be completed within 120 calendar days of receipt, making July 2, 1963, the original completion date. Plaintiff started to work in mid-March.

Progress was slow, and the quality of much of plaintiff's work was deemed unsatisfactory and unacceptable. On June 24, 1963, the administrative contracting officer (ACO) issued a show-cause notice stating that plaintiff had failed to make satisfactory progress to complete the contract on time, and that the government was considering terminating the contract for default. Plaintiff was invited to state reasons why its failure to perform satisfactorily arose out of causes beyond its control and without its fault or negligence.[2]

Plaintiff replied, setting out several reasons for delay and requesting an extension of the completion date to August 2, 1963. The ACO, on June 27, 1963, asked plaintiff for a more detailed explanation. Plaintiff complied by letter of July 5, 1963, in which it elaborated on the previously stated reasons and set out several more reasons.

Meanwhile, plaintiff continued to work. On July 5, while digging trenches at Brandywine to lay new cable, plaintiff's trencher machine inadvertently cut an underground cable servicing one of the antennas. On July 9, the contracting officer issued a stop-work order, pending investigation of the cable-cutting incident. The same day, the order was rescinded when it appeared that the problem had been cleared up. However, within several days, plaintiff cut more cables, rendering other antennas unserviceable; and on July 19, a second and final stop-work order was issued. On September 24, 1963, the termination contracting officer (TCO) issued a notice of default termination and findings of

---

1. Government estimate of contract work cost was $86,000. Bids ranged from $19,927 to $172,888.88.

2. The pertinent contract provision is General Provision 5:

"(a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. * * *

\* \* \* \* \*

"(d) The Contractor's right to proceed shall not be so terminated nor the Contractor charged with resulting damage if:

"(1) The delay in the completion of the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor, * * *"

fact, stating, among other things, that plaintiff

> * * * failed to complete performance of your contract within the prescribed performance period, and the work which you did perform was not accomplished in an acceptable and satisfactory manner. Furthermore, in the course of performance of your contract, you caused damages to, among other things, existing underground cables. You failed to correct deficiencies in your contract performance and failed to repair damages which you caused to existing equipment in an acceptable manner.

Plaintiff wrote letters to the TCO on October 4 and October 16, 1963, asking for reconsideration of the default termination. The TCO reviewed the letters, visited the worksite, and advised plaintiff his decision would stand. Plaintiff appealed to the Armed Services Board of Contract Appeals (Datronics Engineers Inc., ASBCA No. 9506, 65–2 BCA ¶ 5123).

Thereafter, defendant completed the contract using military personnel from Brookley Air Force Base, Alabama, who worked from October to December 1963 and from February to April 1964. On October 5, 1964, the government assessed plaintiff $42,604 excess costs (later reduced to $21,891.77) for completing the contract. Plaintiff appealed to the ASBCA (Datronics Engineers Inc., ASBCA No. 10355, 66–2 BCA ¶ 6069).

In No. 9506, the board held on September 30, 1965, that the default termination was proper. The board said (65–2 BCA, p. 24,127):

> Summarizing the alleged causes of delay apparently relied upon by the appellant * * * we conclude that the appellant was entitled to time extensions of a total of 18 days, extending to approximately 20 July the date for completion of the contract work. We find in the record no reliable evidence upon which to estimate the percentage of contract work completed as of 19 July when the contractor was ordered to stop work, but it is obvious that the work remaining to be done was far in excess of what could be completed in just one day, i. e., by 20 July. The appellant has failed to show and in fact has not even contended that the work under the contract could have been completed by 20 July 1963 had the stop work order not been issued.
>
> * * * We find, in conclusion, that at the time of the issuance of the stop work order on 19 July appellant was in default by virtue of having failed to prosecute the work with such diligence as to insure its completion by the specified completion date of 2 July plus an 18-day extension to which appellant was entitled for delays due to excusable causes. In addition the appellant was in default in damaging and failing to repair promptly the RG 85 cables, and in particular those cables cut 16 July. Since appellant was in default when the contract was terminated, there is no basis for converting the contract termination from a termination for default to one for the convenience of the Government.

* * * * * *

In No. 10355, the board heard testimony and received documents relating to defendant's costs to complete the contract. On January 9, 1967, the board held that the government's excess costs were $162.50, rather than $21,891.77 as the government alleged.

Plaintiff seeks review by this court of the board's decision in No. 9506 under criteria of the Wunderlich Act, 41 U.S.C. § 321. Defendant, by counterclaim, challenges the board's decision in No. 10355 as "unsupported by substantial evidence and * * * erroneous as a matter of law." Both parties filed motions for summary judgment.[3]

---

3. Plaintiff correctly says the board's decision in No. 10355 is moot if its decision in No. 9506 is wrong since no excess costs would be involved in a termination for the convenience of the government. On the other hand, if No. 9506 was correctly

## II.

The board upheld the default termination on two grounds: (a) failure to perform satisfactorily to complete the contract on time; and (b) failure to repair cut cables, particularly those cut on July 16, 1963. On appeal here, plaintiff does not specifically challenge the second ground; and since review of the record shows it to be supported by substantial evidence, the matter could end there, though defendant does not so urge. *Cf.* Ray D. Bolander Co. v. United States, 186 Ct.Cl. 398, 419 (1968). However, since the two grounds relied on by the board are closely related and are inextricably tied up in the facts, the first ground is reviewed in full.

Plaintiff alleged before the board 13 causes of excusable delay, on the basis of which it argued entitlement to a 63-day extension to complete the contract. If correct, the original July 2, 1963 completion date should have been extended to September 3 and the government's stop-work order on July 19 was thus improperly issued. The board considered in detail each alleged cause of delay and held that six were well-founded, giving rise to an 18-day extension. Plaintiff challenges the board's findings with respect to only three of the alleged causes, upon which our attention in this appeal is thus focused: (1) errors in government drawings showing underground cable locations (the board found 2 days' delay); (2) late delivery of certain government-furnished property requiring rescheduling the work (the board found no delay); and (3) unsafe conditions for climbing antenna poles (the board found one-half day delay). A principal argument is that, although the board's decision "may be regarded as supported by the evidence adduced \* \* \* during the hearing of

ASBCA No. 9506," the decision is not supported by substantial evidence when considering "the additional testimony adduced on the same subject matter" in the record in No. 10355. Thus guided by plaintiff's framing of the issue, we consider *seriatim* each of the three challenged causes of delay.

### (1) *Errors in government drawings*

Part of the contract work called for digging trenches to lay new cable (Foamflex) to replace existing RG-85 cable. RG-85 cable, which linked the antennas to the communications buildings, was to continue to operate the antennas until new Foamflex was installed; thus plaintiff had to locate buried RG-85 cables so not to cut them while trenching. The government furnished plaintiff scaled drawings showing existing RG-85 cable runs, as well as runs to be trenched for new cable. New cable runs did not coincide with old. Plaintiff's threshold task, therefore, was to locate the points of intersection of old cable with new trenches.

Relying on the drawings, plaintiff proceeded to locate existing cables by conventional surveying methods, *i. e.,* a transit and surveyor's tape. The drawings, purportedly to scale (1 inch=200 feet), showed the location of antenna poles, old cables, new trenches to be dug, and the communications buildings. Plaintiff's method was to locate the points where the drawings showed new trenches would intersect old cables, then to hand-dig near the points of intersection to locate precisely the old cable.

At Davidsonville, old cables were located and new Foamflex laid without incident. At Brandywine, however, plaintiff had difficulty finding old cables. After an unsuccessful attempt to find

decided, plaintiff contends the decision in No. 10355 is likewise correct.

Plaintiff does not challenge defendant's right to ask review by way of counterclaim under Wunderlich Act standards of the board's decision in No. 10355, a decision with which plaintiff is satisfied. Accordingly, the decision is herein re-

viewed. See Red Circle Corp. v. United States, 398 F.2d 836, 185 Ct.Cl. 1 (1968); but *cf.* Air-A-Plane Corp. v. United States, 408 F.2d 1030, 187 Ct.Cl. 269, 281 (n. 9) (1969); J. L. Simmons Co. v. United States, 412 F.2d 1360, 188 Ct. Cl. 684 (1969).

cables by transit and hand-digging, plaintiff began machine-trenching along routes for new cable, stopping short of places where old cable was supposed to be. Plaintiff cut several RG-85 cables in the open field. Other cables were cut near antenna poles, some close to the downlead point, i. e., where wire connecting the cable to the antenna entered the ground. Plaintiff attempted to repair cut cables in each instance, but repairs were not satisfactory to the government. Soon after the first cable was cut, government personnel suggested that plaintiff find cables by using the tone method, a method by which underground cables can be located electronically from above ground. Toner equipment is conventionally used to find buried cable; and though familiar with it, plaintiff did not have the equipment and made no effort to get it.

Plaintiff alleged before the board that the drawings showing cable runs at Brandywine were in error; that because of the errors, plaintiff was frustrated in its efforts to find buried cables; and that it was entitled to 13 days' excusable delay to locate the cables and repair those inadvertently damaged. The board held (65–2 BCA, p. 24,121):

\* \* \* \* \* \*

By following the drawings appellant successfully found the cables at the Davidsonville site by the transit method. However, appellant encountered difficulties in finding the cables by the transit method at the Brandywine site, and we find from the record that the cables at the Brandywine site were not located as shown on the Government drawings, and that this constituted a changed condition within the meaning of GP 4. Appellant was not at fault in starting out at the Brandywine site, attempting to find cables by the transit method, as appellant did not at that time have any reason to believe that the Government drawings were erroneous. However, it was not proper for appellant to proceed further by the transit method after it became aware that the cables were not located as shown on the drawings, found that use of the transit method was resulting in the cutting of cables, and had been alerted by the Government as to the tone method under which cables could be found without damaging them.

\* \* \* \* \* \*

\* \* \* We find that appellant is entitled to *two days additional time* for the delays in locating cables and repairing damaged cable reasonably resulting from the erroneous drawings and that any additional delay suffered by appellant due to such cause could have been avoided by appellant. (p. 24,-122) (Emphasis supplied.)

 The board's holding is amply supported by the evidence. Though error in the drawings may have rendered them unreliable to locate cable in the open field, at most only three cable cuts were so attributable; and the board's allowance of 2 days' delay in finding such cables and repairing those inadvertently cut was reasonable. However, cuts at or near antenna poles were not the fault of the drawings since it was wholly unreasonable for plaintiff to rely on drawings of the scale given, even if accurate, to locate cables near poles. Plaintiff contends, for example, that in one instance a cable near an antenna pole was cut because it was 5 feet from where the drawing said it should be. On a drawing of scale 1 inch=200 feet, 5 feet is represented by $\frac{1}{40}$ of an inch, about the width of a pencil line. No competent engineer would rely on a drawing so-scaled to do more than indicate generally the position of cable. Precise location must be left to hand-digging, perhaps aided by a toner. Furthermore, the record shows that usual practice is to loop underground cable near antenna poles as much as 5 feet out of straight line. Drawings of the scale given could show neither the extent nor direction of the loop, nor did they purport to. In sum, the evidence is compelling that plaintiff, pressed for time and under an order to show cause, proceeded with machine-trenching near antenna poles, in disregard of existing cable location, and cable cuts were its

own fault. Had plaintiff used the tone method or hand-digging, or a combination thereof, cables could have been located prior to trenching, and cutting thus avoided.

Nor does the evidence in ASVCA No. 10355 help plaintiff. Air Force personnel, working to complete the contract after the default termination, located cables and cut trenches by relying on government drawings, cable markers, and hand-digging. Plaintiff makes much of the testimony of Sergeant Hughes, in charge of the work, that no time would have been saved using a toner. This is scant comfort to plaintiff since it only shows that using due care, cables, particularly near antenna poles, could have been located by proper use of the drawings and hand-digging.

### (2) *Rescheduling of work*

Plaintiff started work on the contract in mid-March 1963. Foamflex cable, to be furnished by the government, was not then available and did not become available until mid-April. Plaintiff says that had Foamflex been at the Brandywine worksite in mid-March, it could have immediately started its trenching operation, would have discovered the errors in the government drawings showing RG-85 cable location, and thus would have had time to obtain a toner to avoid cable-cutting problems.

■ Plaintiff's argument is without merit. The board found as a fact, supported by substantial evidence, that trenching was not scheduled first in any event, so that trenching would not have been done at Brandywine in mid-March even if Foamflex had been available. Furthermore, plaintiff made no attempt to get a toner when cables were cut in July, apparently feeling it did not need one. Nothing in the record suggests plaintiff would have acted any differently had cable-cutting occurred earlier. Thus the board's finding that plaintiff was entitled to no excusable delay for late delivery of Foamflex cable is supported by substantial evidence and is accorded finality.

### (3) *Unsafe antenna poles*

Some of the antennas to be rehabilitated comprised wooden poles, akin to ordinary telephone poles, from the top of which wire and associated electrical connectors were strung. Plaintiff's personnel had to climb the poles to remove old wire and install new. Some poles were in bad condition. The record shows that several had deep cracks and were rotten at the top, making them difficult to climb. When confronted with the situation, government safety personnel inspected the poles and concluded they were safe to climb. Thereafter, plaintiff's men climbed the poles, though their work was slowed down.

Plaintiff contended before the contracting officer that the condition of the poles delayed progress 13 days. Before the board, however, plaintiff alleged no specific number of days' delay. The board held that plaintiff was entitled to one-half day delay, based on testimony of plaintiff's and defendant's witnesses, and principally upon plaintiff's daily work log which noted a one-half day delay on April 25, 1963, because "one of the poles wasn't safe to climb."

■ Before the board in No. 10355, there was evidence that Air Force personnel, completing the contract after the default termination, considered seven poles unsafe to climb and ordered replacements. It is not clear when or if the poles were replaced or whether Air Force workmen climbed the poles, though apparently none were climbed during October to December 1963. Nor is it clear from the evidence to what extent plaintiff encountered the seven poles in question and how much delay plaintiff was caused thereby. In sum, there is no concrete evidence in the records of either Nos. 9506 or 10355 on which to conclude that plaintiff was delayed more than the one-half day allowed by the board; and the board's finding is therefore supported by substantial evidence and is entitled to finality.

In any event, even assuming *arguendo* that plaintiff's workmen encountered all

seven poles and were delayed in their work one-half day per pole, the delay would have been 3½ days rather than one-half day. Under facts found by the board, and supported by substantial evidence, plaintiff was considerably short of completing the contract when work was stopped on July 19, 1963, and 3 additional days could not have salvaged the situation. See Williamsburg Drapery Co. v. United States, 407 F.2d 1342, 187 Ct.Cl. 298 (1969).

### III.

After termination for default, the contracting officer issued an invitation for bids (IFB) for reprocurement. Only one bid was received, the IFB was canceled, and the bid returned unopened. Thereafter, the contract work was completed by GEEIA (Ground Electronics Engineering-Installation Agency), Eastern Region Headquarters, Brookley Air Force Base, Alabama, with Air Force personnel and equipment brought from Alabama to the Maryland worksite.[4] Work began in October 1963, was interrupted by weather between December 1963 and February 1964, and was finally completed in April 1964. All 42 antennas of the original contract were worked on, trenching was completed, and new cable laid. The TCO allowed, and defendant alleged before the board in No. 10355, the following reprocurement costs:

| | |
|---|---:|
| Transportation of equipment | $ 2,399.86 |
| Operation of equipment | 1,145.24 |
| Labor | 16,457.62 |
| Materials | 1,339.78 |
| Travel costs and allowances | 20,476.27 |
| Total | $41,818.77 |

Subtracting plaintiff's contract price, $19,927, leaves the alleged excess cost of reprocurement, $21,891.77, which the board reduced to $162.50 by disallowing travel costs and allowances, $20,476.27,

and by reducing the other costs $1,253. Defendant says the excess cost should have been allowed in full.

*Travel costs and allowances*

Defendant alleged before the board that it used Air Force personnel from Alabama to complete the contract work because Air Force regulations permitted only outside contractors or GEEIA personnel to work on ground electronics installations; that the nearest GEEIA unit with available manpower was in Alabama; and that, under the circumstances, the contracting officer was under no obligation to cut costs by using military personnel stationed closer to the worksite. The board held it was not reasonable to charge plaintiff with costs for transporting and maintaining personnel from Alabama, stating (66–2 BCA, p. 28,108):

\* \* \* \* \* \*

Respondent's evidentiary submission supports its claimed expenditure of $20,476.27 for travel costs and allowances from Brookley Air Force Base, Alabama, to the general vicinity of Andrews Air Force Base, Maryland. However there has been no showing by respondent of sufficient effort to mitigate the costs of reprocurement. No explanation has been proffered as to why it was essential for respondent to go to the inordinate expense of transporting and maintaining, on a per diem basis, military personnel one thousand miles from their home duty station to a situs in the immediate vicinity of a major airbase in order to complete the remaining work. No showing has been made, nor does respondent contend that the skills or personnel necessary to complete the work were not available from the local military population. We are not unmindful that because of Air Force internal, organization and administrative requirements it may have been conveni-

---

4. The contract provided (General Provision 5(a)) that in the event of a termination for default, the government "may take over the work and prosecute the same to completion, by contract or otherwise \* \* \*." Neither party disputes the propriety of using government personnel to complete the contract.

ent to perform the work with uniformed personnel from the GEEIA Eastern Headquarters at Brookley Air Force Base, Alabama. Nevertheless, this was a matter within respondent's control and at its election. In consideration of these circumstances we find that the amount of $20,476.27 assessed for travel costs and allowances is not reasonably attributable to the appellant's default and may not therefore be utilized in respondent's computation of excess costs.

\* \* \* \* \* \*

Defendant challenges the board's holding on the narrow legal ground that the board erroneously put the burden of proof of establishing mitigation of reprocurement costs on defendant rather than plaintiff. Stated another way, under defendant's theory, it was plaintiff's burden to show that the government could have reduced the expense of reprocurement below that incurred in fact; and since plaintiff offered no proofs, it failed to carry that burden. Defendant says plaintiff should have "produced testimony and documents regarding the location of GEEIA installations, the alternate sources of men and equipment, the time and number of men required to complete work on the contract, etc."

Defendant's position is without merit. After the default termination, the contracting officer was entitled to relet bids or to complete the contract with government personnel. In either event, his duty was to act as a reasonable man under the circumstances to complete the contract at minimum cost. H & H Mfg. Co. v. United States, 168 Ct.Cl. 873, 885 (1964). No doubt, it was proper for the Air Force to permit only trained and experienced personnel to supervise work on ground electronics installations. However, the record shows that much of the work required manual, unskilled labor; and defendant did not show why it needed to transport men and equipment from Alabama for such work. Thus, in evaluating the evidence, the board applied the "reasonableness" standard, and its finding that travel costs and allowances were not, under the circumstances, "reasonably attributable to the appellant's default," is supported by substantial evidence and is accorded finality.

*Equipment, labor and materials*

The board also diminished defendant's costs of transportation and operation of equipment, labor and materials by $1,253 on grounds that certain of the work done by the Air Force personnel was not related to the contract. The board said (66–2 BCA, p. 28,108):

\* \* \* \* \* \*

With respect to the repair of five Rhombic antennas and transmission line during mid-March 1964 we find, in the absence of respondent's definitive work records, that such repairs were not a part of the work remaining under appellant's contract, but the repair of damage to previously completed work caused by extreme climatic conditions. We have computed the reasonable value of labor costs for this work and find such to be in the amount of $1103.00. We also find the sum of $20.00 to be the reasonable value of replacement insulators and other materials necessary to complete these repairs together with the sum of $130.00 for operation of equipment.

\* \* \* \* \* \*

Defendant concedes that some work done by the Air Force was not properly chargeable to plaintiff's contract. However, defendant says there is "no evidence by which the board could apportion this amount"; and therefore plaintiff should be charged the full amount. Defendant's position is wholly unjustified. Though the evidence was sketchy, the amount by which the board reduced defendant's costs bears a reasonable relationship to the extra-contract work performed by defendant. The board reduced government costs ($21,342.50), by $1,253, about 6 percent. This is reasonable in light of evidence that only 5 of the 42 antennas were involved; that only part of the work thereon performed was extra-contract work; and that part of the

costs may have been for work on an antenna not included in the contract. Mathematical certainty in apportioning costs was neither possible nor required. Luria Bros. & Co. v. United States, 369 F.2d 701, 177 Ct.Cl. 676 (1966); WRB Corp. v. United States, 183 Ct.Cl. 409 (1968).

### CONCLUSION

Plaintiff's motion for summary judgment is denied; and defendant's cross-motion for summary judgment is granted. Defendant is entitled to recover on its counterclaim only to the extent of $162.50 (as found by the Armed Services Board of Contract Appeals) and judgment is entered for defendant on its counterclaim in the sum of $162.50. Plaintiff's petition is dismissed.