**FEDERAL–MOGUL CORPORATION, Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

No. 76–2698.

United States Court of Appeals, Fifth Circuit.

Feb. 2, 1978.

A. H. Gaede, Jr., Wm. M. Warren, Jr., Alan K. Zeigler, Birmingham, Ala., for petitioner-cross respondent.

Elliott Moore, Deputy Associate Gen. Counsel, John S. Irving, Gen. Counsel, N. L. R. B., Washington, D. C., for N. L. R. B.

John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, W. Christian Schumann, Atty., N. L. R. B., Washington, D. C., for other interested parties.

Before THORNBERRY, Circuit Judge, SKELTON, Senior Judge,* and HILL, Circuit Judge.

SKELTON, Senior Judge.

This case is before the Court on the petition of Federal-Mogul Corporation (the Company) to review and set aside an adverse order of the National Labor Relations Board (the Board). The Board cross-petitions for enforcement in full of its order.

Federal-Mogul is a national company with plants in a number of areas of the country. Its facility in Hamilton, Alabama, which is the site of the present controversy, manufactures 4 to 8 inch taper roller bearings. The plant employs approximately 590 employees, most of whom are skilled or semi-skilled. Plant operations began in late 1972. Throughout 1973 and 1974 the plant was in what the Company termed a "start-up" operation with employees being trained and gaining experience.

Between the early winter of 1973 and May 30, 1975, there were three separate union elections held at the Hamilton plant. The first election was held on March 6, 1974, and the employees rejected representation by the International Aerospace Workers and Machinists (I.A.M.), Aluminum Workers, Steelworkers, and the U.A.W.[1] The second election, held March 7, 1975, resulted in a U.A.W. victory but was set aside on the grounds of U.A.W. misconduct in electioneering. The third election was held on May 30, 1975. The Union lost this election and timely filed objections in case No. 10–RC–10230. On September 3, 1975, a complaint was issued in case No. 10–CA–11342 alleging certain violations of Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 151, et seq., by Company supervisors and a violation of Section 8(a)(3) because of the discharge of employee Edsel Emerson for excessive and unexcused absenteeism. On September 24, 1975, a complaint was issued in case No. 10–CA–11388 charging that a three-day disciplinary suspension of employee Gary Roberts violated Section 8(a)(3) of the Act. These complaints were then consolidated with the Union's election objections and set for hearing before Administrative Law Judge Walter H. Maloney, Jr. The Board adopted the findings and conclusions of Judge Maloney en toto and entered a Decision and Order to that effect, from which petitioner seeks relief from this Court.

A lengthy trial was held in which the General Counsel of the Board, the U.A.W. (the Union), and the Company participated. The transcript of the testimony contains over 1000 typewritten pages. The Administrative Law Judge (A.L.J.) rendered his decision on January 2, 1976, in which he found and concluded that the Company had violated Section 8(a)(1) of the Act by:

(1) Coercively interrogating employees concerning their Union sympathies and activities;

(2) Engaging in surveillance of Union activities and by creating in the minds of employees the impression that it was engaging in surveillance of Union activities;

(3) Destroying Union literature which was the private property and in the private possession of an employee;

(4) Threatening to close the plant and to lay off employees if they selected the Union as their bargaining agent;

(5) Promising better wages if the Union lost the election;

(6) Threatening to discontinue existing benefits if the Union won the election.

* Senior Judge of the United States Court of Claims, sitting by designation.

1. U.A.W. refers to the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, U.A.W.

The Administrative Law Judge also found and concluded that the Company had violated Section 8(a)(3) of the Act by discharging Edsel D. Emerson and by suspending Gary Roberts [for 3 days] from employment in order to discourage membership in and support of the Union. He held that Emerson should be reinstated to his former or substantially equivalent employment and that he and Roberts should be made whole for any loss of pay which they had suffered by reason of the discrimination practiced against them, with interest thereon at 6 percent per annum, and that all critical notes, reports, and evaluations be removed from Roberts' personnel file.

The Administrative Law Judge further held that by the unfair labor practices listed above and the discharge of Emerson, the Company interfered with the freedom of choice of its employees in their selection of a bargaining representative at the election held on May 30, 1975, and by reason thereof he recommended that the results of the election of May 30, 1975 [which showed that the Union lost the election] be set aside and that case No. 10–RC–10230 be severed from the complaint cases and remanded to the Director of the Tenth Region with instructions to conduct a third [sic fourth] election.

The Administrative Law Judge also recommended in his decision that a so-called broad 8(a)(1) form order be issued ordering the Company to cease and desist from unfair labor practices, and that the Company be required to post a notice informing its employees of their rights and the results of this case. He prescribed the form and contents of the notice, which required the Company to admit that it had violated the provisions of the Act in all of the particulars enumerated by the Administrative Law Judge as listed above. The notice exacted a promise from the Company not to violate the Act the same way again and to restore Emerson to his job and make him and Roberts whole for any loss of pay with interest thereon, and required the Company to agree to another union election.

After the trial in this case was concluded and the Administrative Law Judge had rendered his decision setting aside the election of May 30, 1975, and ordering a new election,[2] a subsequent election was held on July 28, 1976, which was won by the Union. Consequently, the Union is presently the bargaining representative of the employees.

### I. Interrogation of Employees.

The Administrative Law Judge found and concluded that the following interrogations of 12 different employees, out of the total work force of more than 500 workmen, were coercive and constituted a violation of Section 8(a)(1) and were objectionable conduct effecting the result of the election:

1. What has the Company done to turn the employees against it?

2. What could the Union do for the employees?

3. Why are the employees supporting the Union?

4. Whether an employee's heart was in the right place?

5. What do you think about the Union?

6. Have you changed your mind as to how you will vote?

7. Is there anything that could be done to change your mind as to how you will vote?

8. Why are you mad at the Company?

9. Why are you wearing Union buttons?

10. Why aren't you wearing the Company "I care" buttons?

11. What does the "Vote yes" pencil clip on your pocket mean?

In determining whether these questions are coercive or tend to be coercive, we must consider all of the circumstances surrounding the questioning. Many of the factors to be considered are set forth in *Bourne v. N.*

---

**2.** The Company does not seek review of that portion of the order requiring a new election since it is not an appealable order. See *Hen-*

*drix Mfg. Co. v. N. L. R. B.*, 321 F.2d 100, 106 (5 Cir. 1963).

*L. R. B.,* 332 F.2d 47, 48 (2 Cir. 1964) as follows:

> "(1) The background, i. e. is there a history of employer hostility and discrimination?
>
> (2) The nature of the information sought, e. g. did the interrogator appear to be seeking information on which to base taking action against individual employees?
>
> (3) The identify of the questioner, i. e. how high was he in the company hierarchy?
>
> (4) Place and method of interrogation, e. g. was employee called from work to the boss's office? Was there an atmosphere of 'unnatural formality'?
>
> (5) Truthfulness of the reply."

For convenience, we will refer to these factors as the *Bourne* Rule, which has been adopted and followed by this Court. See *N. L. R. B. v. Varo, Inc.,* 425 F.2d 293 (5 Cir. 1970); *N. L. R. B. v. Camco, Inc.,* 340 F.2d 803 (5 Cir. 1965); *N. L. R. B. v. Huntsville Manufacturing Co.,* 514 F.2d 723 (5 Cir. 1975); and *Mueller Brass Co. v. N. L. R. B.,* 544 F.2d 815 (5 Cir. 1977); and *Florida Steel Corp. v. N. L. R. B.,* 529 F.2d 1225 (5 Cir. 1976).

The facts in this case show that Hamilton, Alabama, was a small town located in an agricultural area. The employees, along with most of the foremen and supervisors, were recruited from the rural areas and trained in the Company plant. Most of them were friends of longstanding and knew each other on a "first name" basis. The employees frequently took their "coffee breaks" and ate their lunches with various supervisors and foremen. The Company and the employees had experienced three different union elections between the winter of 1973 and May 30, 1975, two of which were won by the Company and one by the Union. During this period of time there was actually one continuous union campaign to become the bargaining agent of the employees. Of course, the Company was against the Union and waged a campaign of its own. It is obvious that during this campaign the atmosphere between the Union and the Company was tense, tempers were short, and both sides were seeking every possible employee vote. It was against this background and during this long period of controversy that the above questions were asked by low-echelon supervisors and foremen of the 12 different employees, separately, and from time to time at their work stations, respectively, in the plant, and during work breaks. All of these circumstances must be taken into consideration in analyzing the interrogations involved here.

Applying the *Bourne* Rule, we conclude, as the Court did in that case, that:

(1) There is very little evidence in the record that shows employer hostility and discrimination toward those supporting the Union.

(2) The information sought was quite general. As a matter of fact, most of the questions were, as stated by us in *Mueller Brass Co. v. N. L. R. B., supra,* "not more than innocuous questions and isolated statements." Furthermore, as we indicated in *N. L. R. B v. Huntsville Manufacturing Co., supra,* these incidents must be placed in the context of an organizing campaign of over 18 months involving a workforce of over 500 employees, with only 12 employees involved in these questions.[3]

(3) The questions were asked by low-ranking supervisors and foremen.

(4) The employees were interrogated informally and casually at their work stations or during their break periods. There was no systematic campaign of interrogation by the Company. The questions were more in the nature of casual remarks among friends.

(5) The replies to the questions were truthful and without any indication that

---

**3.** Only 10 employees out of 1,000 employees were involved in the interrogations in the *Huntsville Mfg. Co.* case. See also *N. L. R. B. v. Southern Materials Co.,* 345 F.2d 240 (4 Cir. 1965) where only 15 out of 542 employees were involved. In *Utrad Corp. v. N. L. R. B.,* 454 F.2d 520 (7 Cir. 1971) only 3 out of 455 employees were questioned.

the questions inspired fear. Actually, some of the employees were wearing Union buttons and insignia when questioned, and they continued to wear them.

(6) There was no evidence that the questions were asked to obtain information for the purpose of reprisals by the Company. Furthermore, the questions themselves were not on their faces threats of reprisals, nor were they coercive.

(7) The questions on the whole were permissible under Section 8(c), 29 U.S.C. § 158(c) (1970) which provides in pertinent part:

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

This Section of the Act guarantees the right of management to converse with employees.[4]

We said in *N. L. R. B. v. Weingarten, Inc.*, 339 F.2d 498, 500 (5 Cir. 1964):

"Section 8(a)(1) of the Act only prohibits activity by an employer which in some manner tends to restrain, coerce, or interfere with employee rights; it is not a proscription of all anti-union activity. Hence, this Circuit has consistently held that interrogation of employees is not illegal per se. To fall within the ambit of Section 8(a)(1), either the words themselves or the context in which they are used must suggest an element of coercion or interference."

In *N. L. R. B. v. Varo, Inc., supra,* we stated that in *N. L. R. B. v. Camco, supra,* Judge Wisdom, in speaking for this Court,

pointed out that in addition to the factors to be considered on employee interrogation as stated in *Bourne*, the additional factor of "whether the employer assured the employees that no reprisals would be taken" might be considered. In the instant case, employee McCarley, who was chairman of the employees' union committee, testified that Plant Manager McLeod told him there would not be any "purge" after the election of those who supported the Union. In this regard, the attitude and policy of the Company is shown in a five-page memorandum that Plant Manager McCloud circulated, and which was introduced into evidence by the Union, that contained the statement, "You cannot threaten any employee or make any promise of a future benefit."

The Administrative Law Judge refused to follow the *Bourne* Rule at the trial when he sustained an objection to a question relating to the truthfulness of an employee's answer to a supervisor's question. At that time the following colloquy occurred between the Administrative Law Judge and the attorney for the Company:

Judge Maloney:

"But, I don't think this falls within anything the Bourne case has any relevance to. Secondly, I don't know that the Board has adopted the rule in the Bourne case. In fact, I don't think it has.[5] And thirdly, we are not in the Second Circuit, and the Bourne case is a Second Circuit case."

Warren:

"There has been a Fifth Circuit case, your Honor, that has adopted the Bourne case criteria, and over the evening I can find you some Board cases."

Judge Maloney:

"That's very good. But, I try cases for the Board, with all due deference to

---

4. *N. L. R. B. v. Huntsville Mfg. Co., supra,* 514 F.2d 723, 725 fn. 5.

5. The Board applied the factors of the *Bourne* Rule in *Pepsi-Cola Bottling Co.,* 211 N.L.R.B. 870 (June 24, 1974) when it held that an employer had not violated the Act when a supervisor questioned an employee concerning his union sentiments where the supervisor and the employees were on a first name basis; where it did not appear that the supervisor was seeking information on which to base taking action against the employee; where the conversation was casual and informal and occurred in an amiable atmosphere; and where the incident was isolated and innocuous in nature.

the Fifth Circuit, for whom I have high regard. Go ahead. Next question."

Of course, the Administrative Law Judge, as an officer of the Government, tries cases not only for the Board, but also for labor and management and the courts. He inferred by the above statement that he would not follow the decisions of this Court. He knows full well that we are authorized and required to review his decision in any case that he tries in this Circuit, if adopted by the Board and if there is an appeal, and that, if such decision is not in accord with the opinions of this Court, the decision will be reversed and enforcement denied. His statement was improper.

■ We hold that the finding of the Administrative Law Judge, adopted by the Board, that the interrogation of the employees by the supervisors and foremen of the Company was coercive and constituted a violation of Section 8(a)(1) is not supported by substantial evidence on the record as a whole. We said in *N. L. R. B. v. Huntsville Mfg. Co., supra*, involving the same problem:

> "This finding ___ is without adequate support in the record; it rests merely upon suspicion or surmise, an inadequate basis. *N. L. R. B. v. Fuchs Baking Co.*, 207 F.2d 737, 739 (5 Cir. 1953)."

We reach the same conclusion in the instant case. Accordingly, the finding of the Administrative Law Judge and the Order of the Board approving such finding are reversed and enforcement of the Board's order on this part of the case is denied.

## II. *Surveillance*

■ Employee Inmon, a Union supporter, asked for a meeting with foreman Steagall to discuss the hiring of his brother, which was granted. Employee McCarley also attended the meeting. Inmon testified at the trial that Steagall said that he had heard a report that employee Allen had banged his fist on a table at a Union meeting and said he would close the plant down. It is obvious that this so-called "report" was little

more than a rumor. There was no evidence that the Company was engaging in a spy operation on the Union activities of the employees. Without any further evidence, the Administrative Law Judge found and concluded that this one isolated report, that one employee out of more than 500 employees testified to, conveyed to McCarley and Inmon the impression that the Union meetings were under surveillance by the Company and that by creating this impression of surveillance of Union activities, the Company violated Section 8(a)(1) of the Act and engaged in objectionable conduct. The Board approved this finding of the Administrative Law Judge. We do not agree with this finding, because it is not supported by substantial evidence on the record as a whole and was an arbitrary decision by the Administrative Law Judge. Employee McCarley testified at the trial about this meeting and recalled nothing that indicated that Union activities were under surveillance by the Company nor that anything occurred that gave that impression. The Administrative Law Judge stated in his decision that Steagall said at the meeting that he had heard "reports" (not "a report" which the evidence showed was the case). The Union and the General Counsel in their brief dismiss this circumstance as a "minor error or inaccuracy" on the part of the Administrative Law Judge. We do not agree. There is a vast difference between "a report" of a Union meeting incident and "reports" of the same. A single report, without more, would indicate that it was a rumor without any surveillance by the Company; whereas, reports (more than one) might indicate a spy operation and surveillance by the Company. We conclude that the only surveillance and impression of surveillance from this incident was in the mind of the Administrative Law Judge without any adequate support in the record as a whole, and that his decision to the contrary was the result of suspicious speculation and surmise on his part.[6]

---

**6.** See *N. L. R. B. v. Mueller Brass Co., supra*; *Mennin Corp.*, 221 N.L.R.B. No. 13 (1975); *G. C. Murphy Co.*, 216 N.L.R.B. No. 113 (1975); and *Field Packing Co.*, 220 N.L.R.B. No. 184 (1975).

We reverse the decision of the Administrative Law Judge and that of the Board that the Company violated Section 8(a)(1) by surveillance and by the creation of the impression of surveillance of Union activities and deny enforcement of that part of the Board's order.

### III. *The Destruction of a Union Card by a Company Foreman.*

During the campaign, the Union distributed a card that had the following words printed at the top:

> "If all the statements the Company put out were true ___ you could blow on this red dot and it would turn blue."

Immediately below this statement there was printed a red dot in the form of a circle ⅝" in diameter and the Union label was printed below the dot.[7] The record shows that before the March, 1975, election (the second election) was held, during a change in the work shift of foreman Bowlby's employees, the workmen were laughing and sticking the red dot card in Bowlby's face and daring, teasing, and bantering him to blow on the red dot on the card to see if it would turn blue. Bowlby picked up one of the cards that was laying on top of employee Emerson's tool box and looked at it and smiled, whereupon Emerson said "blow on it and see if it will turn blue." Bowlby replied, "I bet I can make it turn brown." He then placed a burning cigarette lighter under the red dot until it turned brown and caught on fire. Bowlby then blew out the fire and put the card down. Emerson did not object nor protest in any way to Bowlby's action; and, in fact, laughed with Bowlby about it. At the trial Emerson was asked if the whole incident was a joke and he did not deny it. He admitted in his testimony that he "snickered" and "laughed" when the incident occurred.

■ The Administrative Law Judge held that the red dot card incident was a destruction of Union literature and violated Section 8(a)(1) of the Act and interfered with the holding of a fair and free election.

We do not agree. It is obvious that the entire incident was a joke and occurred in jest for the purpose of evoking laughter, which actually occurred. Foreman Bowlby was merely having fun in responding to what is known in common parlance as "kidding" and "horseplay" by the employees, including Emerson himself. It must be remembered that all of these people were close friends and knew each other on a first name basis, and an incident such as this would not be unusual or unexpected among them. There is no indication that Bowlby's act was designed to hurt Emerson or his property, or to influence or to affect the election.

It should also be kept in mind that this incident occurred *before* the March, 1975, election, and, of course, *before* any petition was filed concerning the election of May 30, 1975, which is the election involved here. There is authority for the proposition that under these circumstances the incident is too remote to be considered in the May 30, 1975, election. See *Goodyear Tire and Rubber Co.,* 138 N.L.R.B. 453 (1962), and *The Ideal Electric and Manufacturing Co.,* 134 N.L.R.B. 1275 (1961).

Regardless of the remoteness of the incident, we conclude that it was not a violation of the Act. The incident is not to be taken out of context, but must be considered along with all of the facts and circumstances existing at the time. When this is done, the decision of the Administrative Law Judge and the order of the Board is not supported by substantial evidence on the record as a whole. The decision of the Administrative Law Judge and the order of the Board on this part of the case is reversed and enforcement thereof is denied.

### IV. *Alleged Threats to Close the Plant, to Lay Off Employees and to Discontinue Benefits if the Union won, and Promises of Better Wages if the Union Lost.*

■ This phase of the trial was a one-sided spectacle in favor of the Union and

---

7. For convenience we will refer to this card as the "red dot card."

against the Company. The Administrative Law Judge allowed the Union to introduce into evidence all of the speeches, statements, circulars, and campaign material made and distributed by the Company, but, on the other hand, refused to admit into evidence, with one exception, the circulars, statements, cartoons, and campaign materials distributed by the Union. In this connection, the Company offered and sought to introduce Exhibits 5(A), 5(B), 5(C), 5(D), 5(E), 5(F), 5(G), 5(H), 5(I), 5(J), 5(K), 5(L), 5(M), 5(N), and 5(O), into evidence, consisting of statements, cartoons, circulars, cards, and miscellaneous election campaign propaganda and material circulated and distributed by the Union during the election campaign. The Administrative Law Judge refused to allow any of these exhibits to be introduced into evidence, except Exhibit 5(J) which was the red dot card described above. In this one-sided state of the record it is impossible for this Court to determine the propriety of the campaign material distributed by the Company and statements made by its officials during the campaign. It is well settled that the Company is entitled to have its statements and campaign material considered in connection with all of the statements and material made and distributed by both sides during the campaign. See *O'Sullivan Industries, Inc.*, 171 N.L.R.B. 1545 (1968); and *Claymore Mfg. Co.*, 146 N.L.R.B. 1400 (1964).

It has repeatedly been held that language used by parties involved in a union representation campaign must not be isolated nor analyzed in a vacuum, but must be considered in light of the circumstances existing when such language was written or spoken. *N. L. R. B. v. Big Three Industrial Gas & Equipment Co.*, 441 F.2d 774 (5 Cir. 1971). Moreover, this Court has not only recognized the right of a party to respond to campaign propaganda used by the opposition, but has recognized that the responsive nature of campaign language is the type of evidence which is important in viewing the circumstances as they existed when the controversial language was used. *N. L. R. B. v. Collins & Aikman Corp.*, 338 F.2d 743 (5 Cir. 1964); *N. L. R. B. v. Big*

*Three Industrial Gas & Equipment Co., supra.* And thus, while it is certainly not the intention of this Court to infer that responsive language may not, in a proper case, be found to be coercive and to be a threat of anti-union discrimination, we are compelled to hold that in the case before us the examiner committed error when he refused to admit into evidence the campaign literature offered by the Company to establish the responsive nature of its own language, and by reason thereof, we are unable to determine whether the material distributed by the Company and the statements of its officials were permissible responses to Union statements and materials distributed by it.

The Administrative Law Judge found objectionable statements of officials of the Company that "without the hostile U.A.W. disrupting this plant, you have a better chance to move forward on wages" and "things will get better as the Union activity gets out." These statements may have been expressions of personal opinions by the officials, or statements of fact. But even more important, they may have been made in answer to statements made by the Union, and in material circulated by it, that the employees would receive higher wages if the Union won. In the latter case the Company had the right to respond. See *N. L. R. B. v. Big Three Industrial Gas & Equipment Co.*, 441 F.2d 774, 777, *supra.*

The Administrative Law Judge found objectionable a statement by the Company that if the Union won it would be the sole spokesman of the employees in grievance matters. The Company points out in its brief that this statement was directly responsive to its proffered Exhibit 5(B), an application for Union membership which was not admitted into evidence by the Administrative Law Judge, which provided in no uncertain terms that the employee agreed as follows:

> "I further irrevocably designate, authorize and empower the said Union exclusively to appear and act for me and in my behalf before any board, court, committee or other tribunal in any matter affecting

my status as an employee, or as a member of said Union, and *exclusively to act as my agent to represent and bind me in the presentation, prosecution, adjustment and settlement of all grievances, complaints or disputes of any kind or character arising out of the employer-employee relationship as fully and to all intents and purposes as I might or could do if personally present.*" (Emphasis added).

The statement of the Company was clearly responsive to the above Union material.

■ The Administrative Law Judge found that the Company's statement was a misstatement of the law and a threat by the Company to discontinue an existing benefit if the Union won the election. The Administrative Law Judge erred in making this finding. Section 9(a) (29 U.S.C.A. § 159(a) of the Act allows an employee to take a grievance to his employer even though he has made a Union his exclusive bargaining agent, provided that any adjustment of the grievance is not inconsistent with a collective-bargaining agreement then in effect, and provided that the bargaining representative has been given an opportunity to be present at such adjustment. It is clear that this qualified right of an employee to take a grievance to his employer is a right or benefit conferred on him by law and is not a company benefit. The Company could no more discontinue this statutory benefit than it could discontinue the benefits of the Wage and Hour Law or the benefits conferred on employees by any other law. Furthermore, the Company never threatened to do so. The record does not show that the Company ever threatened to cut off any company benefit. The finding of the Administrative Law Judge is not supported by substantial evidence.

The Administrative Law Judge found that various Company officials, and especially plant manager McCloud, threatened to lay off employees or to close the plant in the event of a Union victory and promised increased benefits if the Union lost. As stated above, we are unable to determine whether such statements were in response

to Union statements and charges, since the Administrative Law Judge refused to admit into evidence the statements, circulars, and campaign literature of the Union. Under these circumstances, it may be that the statements complained of by the Administrative Law Judge were proper responses to Union charges.

In this connection, the Administrative Law Judge relies a great deal on statements made by plant manager McCloud in 27 speeches made to 27 different employee groups that comprised in the aggregate all of the employees of the company. McCloud spoke on these occasions from a prepared speech, a copy of which was introduced into evidence by the Company. It is significant that the prepared speech contained the statement, "Most of you know that no promise can be made by the Company in regard to wages or benefits during an election campaign." This statement was repeated 27 times in the speeches. We find no threat of layoff of employees, threat to close the plant, or promises of increased benefits in the speeches. The Administrative Law Judge finds support for his finding regarding such alleged threats in a letter contained in the speeches which was read to the employees and which was reproduced and distributed to the employees, and which was introduced into evidence by the Union. The letter was as follows:

"To all Hamilton Plant Employees:

This handout is being given to you to better explain to you and your family the general state of the plant. I have heard rumors, undoubtedly started by the UAW, that things are great, that the Company has lots of money, and that the Company can afford to pay more in wages and benefits. I wish all of these were true, but they are not.

The Hamilton Plant lost money in 1972, 1973, and 1974. At the beginning of 1975, it looked like we were in a position to make a profit for the first time, but many things have happened since the beginning of the year. The economy has slowed down, this Plant has been disrupted with continued Union activity and cus-

tomers have cancelled orders. In fact, in March and April, customers cancelled $1,449,419 worth of orders from the Hamilton Plant. The present outlook is not good, but I remain optimistic.

If we can get this Union business behind us, if our customers gain confidence, and if the economy recovers, as most think it will, then this Plant can again progress forward. In the meantime, I have reluctantly taken some necessary initial steps. There has been a reduction in salaried personnel (office and shop) of about 5%. In an attempt to gain back some business, there is also a price reduction effective June 1 on most of our bearings. These are modest measures, and I hope more severe steps can be avoided."

 The Administrative Law Judge interpreted this letter as containing a threat of layoffs and of closing the plant, and as a statement that the cancellation of orders by the customers of the Company was due to the activity of the Union at the plant. It is well settled that the interpretation of a written instrument is a question of law to be determined by the courts. While the courts may approve and adopt an interpretation of such a document made by an administrative agency if found to be correct, they are not bound to do so. See *N. L. R. B. v. Big Three Industrial Gas & Equipment Co., supra; Tri-Cor, Inc. v. United States,* 458 F.2d 112, 198 Ct.Cl. 187 (1972); *Dale Ingram, Inc. v. United States,* 475 F.2d 1177, 201 Ct.Cl. 56 (1973); *H. N. Bailey & Associates v. United States,* 449 F.2d 376, 196 Ct.Cl. 166 (1971); and *Red Circle Corporation v. United States,* 398 F.2d 836, 185 Ct.Cl. 1 (1968).

 We conclude from our interpretation of the above letter that it does not contain any threats to lay off employees nor to close the plant. The plain meaning of the letter was to discuss with the employees the economic condition of the Company, as well as economic conditions of the country, and to advise them of economic facts that had affected the financial condition of the Company and what the Company had done by way of reduction of personnel to the extent of 5% to remedy the situation. We do not interpret the statement in the letter that customers had cancelled orders in March and April [1975] in the sum of $1,449,419 as being due to the Union activities at the plant, but rather to general economic conditions. In fact, these figures do not represent all of the orders that had been cancelled. The Company introduced into evidence a list of 17 of its major customers showing the amounts of orders cancelled by each of them during December, 1974, and January, February, March and April, 1975, in the total sum of $2,578,479. We conclude that the letter was well within the guidelines stated by the Supreme Court in *N. L. R. B. v. Gissel Packing Co.,* 395 U.S. 575, 617–619, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969) where the Court said:

"But we do note that an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board. Thus, § 8(c) (29 U.S.C. § 158(c)) merely implements the First Amendment by requiring that the expression of 'any views, argument, or opinion' shall not be 'evidence of an unfair labor practice,' so long as such expression contains 'no threat of reprisal or force of promise of benefit' in violation of § 8(a)(1)."

"Thus, an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.' He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control _ _ _."

"If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and

known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment." ___

"As stated elsewhere, an employer is free only to tell 'what he reasonably believes will be the likely economic consequences of unionization that are outside his control,' and not 'threats of economic reprisal to be taken solely on his own volition.' *N. L. R. B. v. River Togs, Inc.* 382 F.2d 198, 202 (CA2d Cir. 1967)."

█ The speeches and statements of McCloud and other officials of the Company were closely related to "economic necessities" and were cast as a prediction of "demonstrable economic consequences" and were thus permissible under *Gissel.*

The Administrative Law Judge found that various statements of foremen and supervisors to certain employees in conversations with them at their work stations constituted threats of layoffs, plant closing, discontinuance of company benefits if the Union won, and promises of better wages if the Union lost. This opinion would be unduly lengthened if we were to trace out, analyze and consider each of these statements that occurred over a period of almost 2 years. We do not think this is necessary. We pointed out in the above section of this opinion regarding the interrogation of employees that these statements were made by low-echelon foremen and supervisors who were friends of the employees and knew them on a first-name basis, and that the statements were made at the work stations or during work breaks in friendly conversations, and that the statements were isolated and innocuous and were not threats or promises of the Company. We reaffirm those conclusions. The statements must be considered in the context of the entire circumstances and situation which existed when each of the statements were made. As the Supreme Court said in *Gissel:*

"Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting."

█ Accordingly, we hold that the findings of the Administrative Law Judge that the statements and printed communications of the officers of the Company to the employees were threats of layoffs, plant closings, discontinuance of company benefits in the event of a Union victory, and promises of better wages if the Union lost, and were violations of Section 8(a)(1) of the Act, are not supported by substantial evidence on the record as a whole, and such findings and the order of the Board approving them are reversed, and the order of the Board on this part of the case is denied enforcement.

## V. *The Discharge of Edsel Emerson.*

The Company discharged employee Edsel Emerson on March 24, 1975, for chronic absenteeism from his work, including his conduct in failing to provide a medical excuse for his absence on March 20, 1975, after he claimed he took his sick son to a doctor in Amory, Mississippi on that day. With regard to Emerson's absenteeism, the Administrative Law Judge found:

"There can be little doubt of Emerson's record of absenteeism, a record which reached back to the commencement of his employment with Federal-Mogul. For this admitted deficiency, he had already undergone the first three steps in the Respondent's *ad hoc* disciplinary procedure—oral warning, written warning, and a three-day suspension late in September, 1975. After receiving a third-step suspension called for by the disciplinary system, Emerson was absent from his employment on some sixteen additional days. Seven of these absences were unexcused; nine were excused."

Despite this finding of Emerson's excessive and unjustified absences from work extending over a long period of time, the Administrative Law Judge found that the Company discharged Emerson because of his union activity, and that in doing so, the Company violated Section 8(a)(3) of the Act, and also engaged in objectionable conduct which affected the result of the May 30th election.

Emerson's supervisor, Bowlby, testified that Emerson's attendance record was the worst of any employee under his supervision. The record shows that between February and September, 1974, Emerson was absent 22 times, 14 unexcused and 8 excused. During the same period he was late to work 3 times.[8] In June, 1974, he was sent a letter of reprimand, which was the second step in the absentee disciplinary procedure of the Company. Emerson was absent again on September 10, 1974, and the next day refused to give supervisor Bowlby an excuse for his absence. After his second unexcused absence in September, Emerson was given a three-day suspension, which was the third step in the disciplinary procedure. After he received this suspension, Emerson was absent 16 additional days, 7 unexcused and 9 excused, as shown in the findings of the Administrative Law Judge, *supra.*

Emerson was absent from work again on March 20, 1975. When he returned to work on March 21, he told supervisor Bowlby that he was absent the previous day because he took his sick son to a doctor in Amory, Mississippi. Later that day, he repeated this statement in the presence of Bowlby and Todd, but said he did not have a doctor's excuse, and did not know the name of the doctor. Still later the same day, he said in the presence of company officers Todd, Myers and Bowlby that he had taken his son to see a doctor in Amory, Mississippi, and when requested to provide a written excuse from the doctor, Emerson said he would give an excuse "at the right time to the right people." Whereupon, personnel manager Myers told Emerson he would have to substantiate the reason for his absence with a written note from the doctor by 3:00 P.M. March 24th or face discipline. When he did not produce the doctor's excuse by that time he was discharged because of his long record of absenteeism and for his failure to co-operate with the Company. Company officers Todd, Bowlby and Myers testified to the above events at the trial. However, Emerson testified that he

never told such officers that he had taken his son to a doctor in Amory, Mississippi, on March 20, 1975.

The Administrative Law Judge not only accepted Emerson's testimony and rejected that of the Company officers aforesaid, but also accused the officers of "fraudulent" acts in requiring Emerson to produce a doctor's excuse for his absence. Such accusation has no support in the record and was wholly unjustified. The Administrative Law Judge also made the statement in his decision that "the Respondent [Company] determined to remove him [Emerson] on the next occasion that his major shortcoming, absenteeism, provided it with an opportunity and a cover story." This statement, except for "absenteeism", has no support in the record and was arbitrary. It is clear that with Emerson's long record of absenteeism that was confirmed and found as a fact by the Administrative Law Judge himself, the Company did not need an "opportunity" nor a "cover story" to discharge him.

The Administrative Law Judge also arbitrarily criticized the Company for waiting from the time Emerson was given a three-day suspension in September, 1974, until the March 20, 1975, incident described above occurred, during which time he was absent 16 days from his work, before it discharged him. Instead of giving the Company credit for its patience and forbearance with regard to Emerson's absenteeism during this long period of time, the Administrative Law Judge attributed an improper motive to the Company for its leniency and tolerance toward Emerson during this period. The finding of the Administrative Law Judge in this respect is not supported by substantial evidence and is without any support in the record.

Following Emerson's discharge on March 24, 1975, the Union filed a complaint against the Company alleging that by its termination of Emerson's employment it had violated Section 8(a)(3) of the Act. The

---

**8.** The Company had a Four-step disciplinary procedure for absenteeism, namely (1) oral warning, (2) written warning or reprimand, (3) a three-day suspension and (4) discharge.

complaint was docketed as Case No. 10–CA–11201. The Regional Director of N.L.R.B. investigated and considered the case and concluded on March 20, 1975, that the evidence showed that Emerson was terminated for good cause rather than because of any discriminatory motivation on the part of the Company. The Union did not appeal this decision. After the Union lost the election on May 30, 1975, it filed another complaint relative to the discharge of Emerson. At the trial of the instant case, the Company called all of these facts to the attention of the Administrative Law Judge, and contended that the same absenteeism of Emerson was involved in both complaints. The Administrative Law Judge paid no attention to the previous complaint and to the decision thereon of the Regional Director other than to say he took judicial notice of the fact that the previous complaint was a part of the record in Case No. 10–CA–11201.

The discharge of Emerson in this case is similar to the discharge of an employee by the Company in *N. L. R. B. v. Mueller Brass Co.,* 509 F.2d 704 (5 Cir. 1975), where the employee claimed his absence was due to his visit to a doctor's office. The Company contacted the doctor's office and found that it had no record of a visit by the employee, whereupon the Company discharged the employee. We held in that case that:

> "Any employer has the right to demand that its employees be honest and truthful in every facet of their employment." (509 F.2d at 713).

In the instant case the overwhelming weight of the substantial evidence shows that Emerson told an untruth three different times to the officers of the Company about taking his son to a doctor. This alone was sufficient ground for the Company to discharge him. However, the predominant reason for his discharge was his chronic absenteeism that existed throughout the period of his employment with the Company. The incident of March 29, 1975, was but the culmination of a long series of Emerson's absences from work, although it appears that the Administrative Law Judge at-

tempted to isolate it from the other absences and make it the focal point of Emerson's discharge. Such reasoning is without adequate support in the evidence.

The burden of proof in a case such as this is upon the General Counsel and requires that he present substantial evidence that the discharge came from improper motives. *Frosty Morn Meats, Inc. v. N. L. R. B.,* 296 F.2d 617 (5 Cir. 1961). Furthermore, mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. An unlawful purpose is not lightly to be inferred. *N. L. R. B. v. Federal Pacific Electric Company,* 441 F.2d 765 (5 Cir. 1971). The employer does not have the burden of disproving the existence of unlawful motivation in discharging an employee. See *N. L. R. B. v. Varo, Inc., supra,* and *N. L. R. B. v. Soft Water Laundry, Inc.,* 346 F.2d 930, 936 (5 Cir. 1965).

In the instant case, the General Counsel made no attempt to prove that Emerson was fired because of his activities in support of the Union, and without such proof the Company was justified in discharging him because of his absenteeism and failure to cooperate with the Company even if the Company was opposed to the Union.

In *Mueller Brass Co. v. N. L. R. B.,* 544 F.2d 815, 819, we quoted with approval the following statement from our opinion in *N. L. R. B. v. McGahey,* 233 F.2d 406, 412–13 (5 Cir.):

> "As we have so often said, ' . . . management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. *Management can discharge for good cause, or bad cause, or no cause at all.* It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a)(3) forbids.' " (Emphasis supplied.)

In *Mueller Brass Co. v. N. L. R. B., supra,* we also held:

> "Absent a showing of antiunion motivation, an employer may discharge an

employee without running afoul of the fair labor laws for a good reason, a bad reason, or no reason at all. *N. L. R. B. v. Fuller Super Markets, Inc.*, 374 F.2d 197 (5 Cir. 1967)." (544 F.2d at page 819).

The D.C. Circuit Court of Appeals followed the *Mueller Brass Co.* and *Fuller Super Markets* cases in *Clothing Workers, Midwest Regional Joint Board v. N. L. R. B.*, 564 F.2d 434, D.C. Cir. 1977, where it held:

"Absent a showing of anti-union motivation, an employer may discharge an employee for a good reason, bad reason, or no reason at all, without running afoul of the labor laws. *N. L. R. B. v. O. A. Fuller Super Markets, Inc.*, 374 F.2d 197, 200 (5th Cir. 1976). In addition, the mere fact that a specific employee not only breaks the company rule but also evinces a pro-union sentiment alone is not sufficient to vitiate just cause for his discharge. *Mueller Brass Company v. N. L. R. B.*, 544 F.2d at 819. When good cause for discharge or suspension is clearly established, the burden is on the Board to show that anti-union animus was the motivating factor. (Citations omitted). The burden on the Board is not simply to discover some evidence of improper motive, but to find an affirmative and persuasive reason why the employer rejected a good cause and chose an illegal one. (Citation omitted). The mere existence of anti-union animus is not enough."

When an employee is discharged for good cause, the fact that the employer may "harbor an antipathy toward the employee grounded in anti-unionism does not make the discharge unlawful." *Frosty Morn Meats*, 296 F.2d at 620. In *Klate Holt Co.*, 161 N.L.R.B. 1606 (1976) the Board said:

". . . If an employee provides an employer with a sufficient cause for his dismissal by engaging in conduct for which he would have been terminated in any event, and the employer discharges him for that reason, the circumstance that the employer welcomed the opportunity to discharge does not make it discriminatory and therefore unlawful."

It is well settled that substantial evidence on the record as a whole must exist to support an inference of unlawful employer motivation in the discharge of an employee. Mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. An unlawful purpose is not to be lightly inferred. In this connection, we held in *N. L. R. B. v. Federal Pacific Electric Co.*, 441 F.2d 765, 770 (5 Cir. 1971):

"Ascribing proper weight to the credibility determinations of the Examiner, *Universal Camera Corp. v. N. L. R. B.* [340 U.S. 474, 71 S.Ct. 545, 95 L.Ed. 456], *supra*, the conclusion seems inescapable that no substantial evidence exists to support any inference of unlawful employer motivation. Substantial evidence is 'more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate to support a conclusion.' *Consolidated Edison Co. v. N. L. R. B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). Mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. *Lozano Enterprises v. N. L. R. B.*, 357 F.2d 500 (9th Cir. 1966). It is incumbent upon the General Counsel of the Board to prove unlawful conduct and an unlawful purpose is not lightly to be inferred. 'In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of *believable* evidence pointing toward the unlawful one.' *N. L. R. B. v. McGahey*, 233 F.2d 406, 413 (5th Cir. 1956). [Emphasis in the text.] Seemingly arbitrary discharges, even if harsh and unreasonable, are not unlawful unless motivated by a desire to discourage protected union activity."

The Board has held many times that excessive absenteeism or tardiness is a valid reason for an employer to discharge an employee. See *Engineered Steel Products, Inc.*, 188 N.L.R.B. 298 (1971); *Iowa Beef Processors, Inc.*, 186 N.L.R.B. 521 (1970); *Aircraft Eng. Corp.*, 172 N.L.R.B. 1993 (1968); *Grand Foundries, Inc. & Carl Maples*, 173 N.L.R.B. 967 (1968).

■ Applying the foregoing principles to the instant case, we hold that the Company had good cause to discharge Emerson, and that the General Counsel did not prove that his discharge was due to any improper or unlawful motivation on the part of the Company. The finding to the contrary by the Administrative Law Judge was based on speculation, conjecture and surmise and is not supported by substantial evidence on the record as a whole. The following statement in our opinion in the *Frosty Morn Meats* case, *supra*, is applicable here:

" \_ \_ \_ when the evidence of just cause for discharge is as great as it is here, the record as a whole does not support the conclusion that the discharged employee was deprived of any right because of union activities." 296 F.2d 617 at 621.

Upon considering the record as a whole, we reached the same conclusion as that stated by our court in the *Mueller Brass Co.* case where we said:

"We are literally shocked by the conclusion of the Board that Rogers was discharged in violation of the Act and that he is entitled to be reinstated." (544 F.2d 815 at 819.)

The record in this case shows conclusively that Emerson is not entitled to be reinstated to his position with the Company with back pay. Such a reinstatement would be punitive in nature as far as the Company is concerned. We held in *Frosty Morn Meats* that:

"The power of reinstatement is remedial. It is not punitive. It is not to penalize an employer for anti-unionism by forcing on the pay-roll an employee unfit to stay on the job." (296 F.2d 617 at 621).

Under the facts in this case, the Company should not be punished for discharging Emerson by requiring it to reinstate him with back pay. The discharge was justified and for good cause.

The finding of the Administrative Law Judge and the order of the Board that the Company violated Section 8(a)(3) of the Act in discharging Emerson and that he should be reinstated with back pay are set aside, and that part of the Board's order is denied enforcement.

## VI. *The Three-Day Suspension of Gary Roberts.*

■ Gary Roberts had been employed by the Company as a set-up man in the automatics department of the Hamilton plant for almost three years when he was suspended for three days by the Company for poor workmanship. Each time that there was poor performance by Roberts in his work, his foreman, Bowlby, made a notation to that effect in his records. Before the suspension occurred on July 24, 1975, a long list of poor work performances by Robert had been compiled. We see no necessity of enumerating and considering each of them. While the Administrative Law Judge made light of them and called some of them trivial, the Company did not so regard them. The Company is the best judge of the workmanship of its employees. Management is for management. *N. L. R. B. v. McGahey, supra.* Even the Administrative Law Judge found that between May 9 and July 10, 1975, Bowlby made eleven entries in his records showing poor workmanship by Roberts. Between July 10 and July 24, 1975, he found that Bowlby noted seven deficiencies by Roberts on six different work days. The Administrative Law Judge found that these entries were anti-union motivated since Roberts was a union activist, and because of this fact Bowlby entries should be "regarded with considerable *suspicion*." (Emphasis supplied). The Administrative Law Judge further found that Bowlby's entries were the result of a studied attempt to "make a case" against Roberts and to lay the groundwork for his "termination" because of his work for the Union. We find no support in the record for these findings and statements of the Administrative Law Judge. We find them to be based on nothing more than "suspicion" on his part, which is the term he used to describe them. We held in *N. L. R. B. v. Federal Pacific Electric Co., supra,* that "mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence."

■ In the section of this opinion dealing with the discharge of Emerson we cited and quoted from *N. L. R. B. v. McGahey, supra*; *Mueller Brass Co. v. N. L. R. B., supra*; and *Clothing Workers, Midwest Regional Joint Board v. N. L. R. B., supra*, to the effect that absent a showing of anti-union motivation, an employer may discharge an employee for a good reason, a bad reason, or no reason at all. In the instant case there has been no showing by the General Counsel of anti-union motivation in connection with the disciplinary action taken by the Company against Roberts. The General Counsel has this burden where good cause exists. See *Clothing Workers, Midwest Regional Joint Board v. N. L. R. B., supra.* Consequently, there was no need for the Company to "make a case" against Roberts or "lay the foundation for his termination" if the Company decided to discharge him.

It is significant that although Roberts was given a three-day suspension on July 24, 1975, he was still working for the Company on October 20, 1975, when this case was tried. As far as we know, he is still an employee of the Company. If the "suspicion" of the Administrative Law Judge that the Company intended to fire Roberts had any basis in fact, the Company could have discharged him long ago.

The facts show that Roberts was reprimanded orally on January 20, and again on May 8 by Bowlby for his poor workmanship. On July 10 he was given a written reprimand and a list of 12 incidents of unsatisfactory performance. He was told at that time that he would have two weeks to improve or he would be terminated. At the time of the July 10 reprimand the Company had a three-step disciplinary procedure for dealing with unsatisfactory job performance, namely, oral warning, written warning, and discharge. Between July 10 and July 24, the Company added a fourth step, a three-day suspension, so that it would be the same as the disciplinary procedure for absenteeism. This change was favorable to Roberts because it gave him an additional opportunity to improve his work should it be required. However, the Administrative Law Judge, instead of praising the Company for giving Roberts and its other employees the benefit of a fourth step in its disciplinary procedure for poor job performance, found that this action by the Company was to enable the Company to suspend Roberts because of his support of the Union instead of discharging him as it had originally intended. This finding by the Administrative Law Judge was pure speculation and suspicion, as there is no support in the record for it.

At the end of the two-week period following the reprimand given Roberts on July 10, he had not improved his work performance, and he was given a three-day suspension by the Company. The Administrative Law Judge found that the poor workmanship "excuse" of the Company was "pretextual" and that Roberts' suspension was discrimination in hire or tenure designed to discourage union membership and activities in violation of Section 8(a)(3) of the Act. He recommended that Roberts be made whole by reason of the discrimination practiced against him, with interest at 6 percent per annum. The Board approved these findings and the recommendation of the Administrative Law Judge.

It should be noted that Roberts was not suspended until July 24, 1975, which was almost two months after the May 30, 1975, election. Obviously, the suspension could not have affected Union membership or activities involved in that election.

■ It is well settled that poor work performance is good cause for disciplinary action by an employer against an employee. See *Trailmobile*, 221 N.L.R.B. No. 178 (1975) and *Gateway Press*, 220 N.L.R.B. No. 102 (1975). There is no violation of Section 8(a)(3) if the disciplinary action is motivated by poor workmanship by the employee instead of by his union activities. *N. L. R. B. v. Stevenson Services, Inc.*, 414 F.2d 232 (5 Cir. 1969); *Central Freight Lines, Inc.* 179 N.L.R.B. 914 (1969); and *Motel 6, Inc.*, 179 N.L.R.B. 509 (1969). We conclude that Roberts was suspended for good cause.

We hold that the findings and recommendations of the Administrative Law Judge

with reference to the suspension of Roberts, and the order of the Board approving the same, are not supported by substantial evidence on the record as a whole, and are set aside. The order of the Board on this part of the case is denied enforcement.

## VII. *Bias of the Administrative Law Judge.*

The Company says that the Administrative Law Judge was biased in favor of the Union and against the Company. It is fundamental that a controversy of this kind must be tried by a fair and impartial Administrative Law Judge. Otherwise, there will be a denial of due process to one of the parties. The General Counsel contends that the bias charge was not presented to the Board by the Company and, therefore, Section 10(e) of the Act prohibits the question from being raised here. The Company counters with the argument that it filed 91 exceptions with the Board to the report of the Administrative Law Judge and that many of them dealt with the predisposition of the Administrative Law Judge against the Company, although the words "bias" and "predisposition" were not used. The Company contends that the bias issue was raised before the Board by these exceptions and the issue is properly before this court.

Considering all of the proceedings in this case and the record as a whole, it is understandable that the Company felt that it should bring bias charges against the Administrative Law Judge. However, it would unduly lengthen this already long opinion for us to carefully analyze and consider each of the long list of allegations the Company says show that the Administrative Law Judge was biased against it and was predisposed to decide the case in favor of the General Counsel and the Union. Furthermore, we find it unnecessary for us to decide the bias question in view of our disposition of the case.

## VIII. *Conclusion.*

Accordingly, we hold that the Board's order is not supported by substantial evidence on the record as a whole and is set aside. Enforcement of the Board's order is hereby denied.

THORNBERRY, Circuit Judge, specially concurring:

Most of the issues in this case have in effect been mooted by the union's success in the fourth representation election at the company's Hamilton plant. Under these circumstances I think the Board's "broad form" order is inappropriate, and I thus concur in the result reached by the majority regarding the issues discussed in parts I–IV of Judge Skelton's opinion.

The alleged section 8(a)(3) violations—the discharge of employee Emerson and the suspension of employee Roberts—are more troublesome, and I write separately to emphasize the closeness of the issues and the nature of our review. Moreover, language employed by the majority seems to suggest an improper legal test in the critical area of employee discharge, a test I view as contrary to our previous decisions.

Emerson was hardly a model employee, his record having been sullied with what can fairly be labeled excessive absences. The majority examines his chronic absenteeism in considerable detail, but fails to mention that despite such a record, he was not discharged until he became quite vocal in the union's organizing campaign. The timing of a discharge can be an indication of an employer's motivation, *see Goodyear Tire & Rubber Co. v. N. L. R. B.*, 456 F.2d 465 (5 Cir. 1972); *N. L. R. B. v. Central Power & Light Co.*, 425 F.2d 1318 (5 Cir. 1970), and discharging union adherents is a rather hefty club an employer can swing against an incipient unionization movement.

Roberts, on the other hand, had performed well on the job. During his first two years with the company, his work was such that only one minor infraction appeared in his file. However, his performance began to suffer, and a foreman made numerous entries in his records regarding Roberts' poor workmanship. However, this decline in quality paralleled Roberts' display of support for the union, suggesting that the company was going out of its way

to find flaws in Roberts' work. *See Central Power & Light, supra* (company officials were "lying in wait" to discover infractions by employee who backed union). Unlike Emerson, however, Roberts was not disciplined by the company until well after the third representation election on May 30. He was suspended for three days on July 24, 1975, while Emerson was discharged on March 24, just over two weeks after the union's victory in the second election on March 7. That election was subsequently set aside because of union misconduct.

Obviously, the record in a case such as this will not contain an employer's statements suggesting his motivation in discharging an employee. Any employer who has competent legal advice is not about to state blatantly that a particular discharge was prompted by his anti-union sentiment or that a pro-union employee was suspended "to set an example" for the other workers. Rather, such motivation must be inferred from the actions of the employer and the supervisory personnel, much like the existence of a criminal conspiracy must often be inferred from the actions of the alleged co-conspirators. In this case the majority refuses to draw any such inferences or to accept the inferences drawn by the administrative law judge. In my view, these inferences are certainly permissible on this record, and under the substantial evidence rule we are obligated to consider them as part of the record *as a whole. See N. L. R. B. v. Federal Pacific Electric Co.,* 441 F.2d 765 (5 Cir. 1971).

Of course, it is incumbent on the Board to prove unlawful conduct, and improper motivation is not to be lightly inferred. *N. L. R. B. v. McGahey,* 233 F.2d 406 (5 Cir. 1956); *Federal Pacific Electric Co., supra.* Moreover, we have said that the record must establish a "reasonable inference of causal connection between the employer's anti-union motivation and the employee's discharge." *N. L. R. B. v. O. A. Fuller Super Mkts., Inc.,* 374 F.2d 197, 200 (5 Cir. 1967). "If there are two grounds for discharge, one proper and the other unlawful, and the evidence as a whole would make the inferences as to which was the motivating cause reasonably equal, the conclusion reached by the Board should be sustained." *N. L. R. B. v. Hudson Pulp & Paper Co.,* 273 F.2d 660, 666 (5 Cir. 1960); *N. L. R. B. v. Longhorn Transfer Service, Inc.,* 346 F.2d 1003, 1006 (5 Cir. 1965); *Cramco, Inc. v. N. L. R. B.,* 399 F.2d 1, 6 (5 Cir. 1968).

In this case, the Board has failed to carry its burden, for the inferences set forth above fall considerably short of being "reasonably equal" to the inferences and evidence that the discharge and suspension were lawful, especially since improper motivation is not to be lightly inferred. Therefore, I agree that the discharge and suspension were not prompted by anti-union motivation, but I do feel that in fairness we should discuss the inferences of improper action on the company's part.[1]

Another difficulty for me is language in the majority opinion suggesting a departure from this court's established rules concerning employee discharge. There is no doubt that, absent a showing of anti-union motivation, an employer may discharge an employee for a good reason, a bad reason, or no reason at all without running afoul of the labor laws. When there appears to be more than one reason for the discharge, one proper and the other improper, the employer has the burden of establishing good cause, and when that burden is met, the Board must show that union animus was the motivating factor.

The majority apparently applies these principles and concludes that there was good cause to fire Emerson and that there was an insufficient showing of anti-union motivation. *Ante* at 1260, 1261. As indicated previously, I agree. However, the majority opinion also contains language

---

1. I note here that the inferences of improper unlawful action were much stronger in Emerson's case than in Roberts', since Emerson's discharge came between two representation elections and immediately after his union activism surfaced. Roberts, however, was suspended some five months after he began to display support for the union, and some two months after the third election.

suggesting that a "but for" test is applicable in the discharge context, a sugsion, *ante* at 1259, the majority seems to embrace the rule that when there are both proper and allegedly improper grounds for discharge, the Board's burden is to show that the discharge would not have occurred *but for* the improper reason. *See Coletti's Furniture, Inc. v. N. L. R. B.*, 550 F.2d 1292 (1st Cir. 1977).

However, this Court has repeatedly held that the existence of a good cause to fire an employee cannot validate a dismissal that was in fact motivated by union animus. *E. g., N. L. R. B. v. Big Three Indus., Inc.*, 497 F.2d 43, 49 (5 Cir. 1974); *N. L. R. B. v. Central Power & Light Co.*, supra at 1322. This standard is obviously contrary to a "but for" test under which an employer filled to the brim with union animus can nonetheless fire an employee who is a union activist if that employee would have been fired anyway.

The Supreme Court has utilized a "but for" test in first amendment cases, *e. g., Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), but that hardly means the test is appropriate in the labor context. In *Mt. Healthy* the Court, as it has done so often, struck a balance between competing interests. Similar competing interests exist in the labor setting, but there Congress has already established a balance by passing the labor laws. That balance favors the employee, for Congress clearly recognized the superior bargaining position of the employer. *See American Shipbuilding Co. v. N. L. R. B.*, 380 U.S. 300, 316, 85 S.Ct. 955, 966, 13 L.Ed.2d 855 (1965) (labor laws attempt to redress the "imbalance of economic power between labor and management"). The "but for" standard significantly restrikes this balance in favor of the employer, and such a test is contrary to Congressional policy and the case law in this Circuit.